**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Daniel J. BALINT and James A. Ketchum, Defendants– Appellants.**

Nos. 98–3130, 98–3143.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 13, 1999.

Decided Jan. 11, 2000.

930

Mel S. Johnson (argued), Office of the U.S. Attorney, Milwaukee, WI, for plaintiff–appellee

William R. Kerner (argued), Milwaukee, WI, for defendant-appellant Daniel J. Balint.

John T. Wasielewski (argued), Wasielewski & Erickson, Milwaukee, WI, for defendant-appellant James A. Ketchum.

Before POSNER, Chief Judge, and CUDAHY and KANNE, Circuit Judges.

CUDAHY, Circuit Judge.

At 5:30 a.m. on September 29, 1994, a brown Plymouth pulled up at the Wisconsin Women's Health Care Center in Milwaukee. It was parked to block the front entrance to the building. Inside, defendant James Ketchum and Michael Skott sat in a steel cage they had welded into the car. Defendant Daniel Balint had secured his head into a steel box affixed to the inside of the car; a hole had been cut in the bottom of the car, and his body extended out the hole to recline on the ground. Meanwhile, a blue Chevrolet pulled to a stop at the rear entrance to the clinic. In the driver's seat sat Robert Stambaugh, with his neck locked into a steel collar. The collar was secured to a pipe that had been welded to a clothes dryer, which in turn had been welded to the car frame. Inside the dryer sat George Wilson, whose

neck was locked into a similar collar-and-pipe contraption. Wilson's legs and lower body reclined on the ground. Robert Braun sat in the back seat of the car, with his arm fastened into a steel pipe that had been welded to the car. Because two of the men were in effect suspended from the cars, police could not simply drive them away to clear the entrances to the clinic. Twenty-seven Milwaukee firefighters used power tools and blow torches to dismantle the interlocking cages and collars. Four hours after firefighters arrived on the scene, they were able to extricate the men and remove the cars from the clinic doors. By that time, twelve patients had been forced to cancel their appointments for reproductive health services.

## I. DISPOSITION BELOW

The six men were charged with violating 18 U.S.C. § 248(a)(1), known as the Freedom of Access to Clinic Entrances Act (Access Act). The Access Act subjects violators to a maximum six-month imprisonment, a maximum $10,000 fine, or both. The procedural prelude to this appeal is complex. Balint and Skott consented to a bench trial before a magistrate judge. Wilson, Ketchum, Stambaugh and Braun requested trial before a district judge. Wilson, Ketchum and Stambaugh requested jury trial. Magistrate Judge Aaron Goodstein granted Balint and Skott's request for a magistrate trial and granted the remaining defendants' request for trial by a district court judge. District Judge Rudolph T. Randa overruled that decision and ordered all six defendants to stand trial together before the district court. Magistrate Judge Goodstein had also granted the motion of Wilson, Ketchum and Stambaugh for a jury trial; the government appealed this ruling to Judge Randa, who did not rule at that time.

Several motions to dismiss ensued. Balint moved to dismiss on the bases that the Access Act was unconstitutionally vague and that Congress had no authority under the Fourteenth Amendment or the Commerce Clause to adopt it. Ketchum also moved to dismiss the case on the Commerce Clause grounds. Judge Randa granted the defendants' motion to dismiss, finding passage of the Access Act to have exceeded Congress's power under the Commerce Clause. We overturned that holding in *United States v. Wilson*, 73 F.3d 675 (7th Cir.1995). As a result, Judge Randa set the case for trial. In his pre-trial orders he overturned Magistrate Goodstein's order granting a jury trial. Ketchum appeals this denial of a jury trial.

At the bench trial before Judge Randa, the defendants admitted they had erected the blockade. They each expressed their opposition to abortion, and their commitment to saving "pre-born babies." Order at 4. However, defendant Balint argued at trial and again on appeal that the government failed to prove he acted with the motive required to violate the Access Act. Balint also argued unsuccessfully below and reasserted on appeal that the Access Act is unconstitutionally vague and failed to give him adequate notice that his actions would trigger prosecution. The judge disagreed, and found all six defendants guilty on April 30, 1997. More than a year later, in August 1998, Judge Randa sentenced Balint and Ketchum each to time served and a $10 assessment. He also ordered the six defendants to pay $1,759.04 to the City of Milwaukee as restitution for the cost of the firefighters' rescue operation. The defendants were made jointly and severally liable for the full amount of the restitution. On April 3, 1999 defendant Michael Skott paid the restitution in full. The United States Attorney for the Eastern District of Wisconsin released the liens against Balint and Ketchum three days later. Both Balint and Ketchum appeal the restitution order.

To recap, Ketchum appeals the denial of his request for a jury trial. Balint appeals his conviction on the ground that the government presented insufficient evidence of his illegal motive. Balint also argues that the Access Act is unconstitutionally vague, thereby giving him inadequate notice that he was breaking the law. Ketchum adopts

this argument on appeal, in accord with Federal Rule of Appellate Procedure 28(i). Balint and Ketchum both appeal the restitution order.

## II. ANALYSIS

### A. Sufficiency of the Evidence

■ The Access Act states that penalties are available against whomever:

by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services.

18 U.S.C. § 248(a)(1). Parsing this language, a violation of the Act has three elements. The first element is the use or threat of force or physical obstruction of a clinic. The district court found it "beyond dispute" that the defendants obstructed the entrance of the clinic. Order at 2. The Act's second element is that the obstruction intentionally injure, intimidate or interfere with or attempt to injure, intimidate or interfere with persons. The Act defines "interfere with" as "to restrict a person's freedom of movement." 18 U.S.C. § 248(e)(2). The district court found the facts "clearly show[ed] that the defendants intended their obstruction to prevent or attempt to prevent the entrance or egress of anyone to the building." Order at 2. Balint concedes the sufficiency of the evidence on elements one and two.

■ However, he complains that the government presented insufficient evidence on the Act's third element, which requires that the defendant's actions be taken "because ... [the interfered-with] person is or has been, or in order to intimidate such person or any other person or class of persons from, obtaining or providing reproductive health services." 18 U.S.C. § 248(a)(1). The Access Act differs from most criminal statutes in requiring the government to prove the defendant's motive. Moreover, it requires different

motives for different acts. To be found guilty of *interference* under the Act, as Balint was, the accused must be motivated *because* people *are* or *have been obtaining or providing* reproductive health services. Judge Randa stated that the defendants, "by admitting that their motive for obstructing the clinic was to protect pre-born babies from being killed in their mothers' wombs, admit to a motive proscribed by the statute." Order at 4. We understand this statement to mean that the judge found Balint was motivated by the possibility that abortions would take place in the near future on the day of the blockade.

Balint argues that the statute's temporal language associates guilt only with interference prompted by *past* provision of abortion services or *present* provision of abortion services. Interference prompted by a desire to prevent the *future* provision of services, he says, is not proscribed by the statute. He insists that when Congress criminalized interference with a person "because that person *is ... obtaining or providing* reproductive health services," it barred interference only with abortions taking place contemporaneously with the protest. 18 U.S.C. § 248(a)(1) (emphasis added). In short, Balint would have us find that unless an abortion was actually in progress at the time the Plymouth drew to a stop in front of the clinic, he lacked the requisite motivation.

■ When we interpret a statute, we look first to its language. *Pittway Corp. v. United States*, 102 F.3d 932, 934 (7th Cir. 1996). If that language is plain, our only function is " 'to enforce it according to its terms.' " *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917)). The plain meaning of a statute is conclusive unless " 'literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.' " *Ron Pair*, 489 U.S. at 242, 109 S.Ct. 1026 (quoting *Griffin v. Oceanic Contractors*, 458

U.S. 564, 571, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982)). Therefore, our interpretation is guided not just by a single sentence or sentence fragment, but by the language of the whole law, and its object and policy. *See Grammatico v. United States*, 109 F.3d 1198, 1204 (7th Cir.1997) (citing *United States v. Heirs of Boisdore*, 49 U.S. (8 How.) 113, 12 L.Ed. 1009 (1849)). Further, we may adopt a restricted rather than a literal meaning of a word where acceptance of the literal meaning would lead to absurd results. *See Chicago Transit Auth. v. Adams*, 607 F.2d 1284, 1289–90 (7th Cir.1979); *see also Commissioner v. Brown*, 380 U.S. 563, 571, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965).

The nub of Balint's argument is that, when Congress used the present tense phrase "is ... obtaining or providing," it criminalized blockades only if they were simultaneous with the provision of health services at a clinic. The government dismisses this grammatical argument as hypertechnical, but the Supreme Court does not consider grammar a mere technicality. It has stated that "Congress' use of a verb tense is significant in construing statutes." *United States v. Wilson*, 503 U.S. 329, 333, 112 S.Ct. 1351, 117 L.Ed.2d 593 (1992). The problem with Balint's argument is that it is not technical enough. He claims that because Congress used the present tense, only interference motivated by present abortions will do. Technically, however, the present tense is far more versatile than Balint would have it. It often indicates contemporaneous action, as he states, particularly in the simple present tense. *See* Robert Perrin, The Beacon Handbook 146–47 (4th ed. 1997). However, use of the present progressive tense, formed by pairing a form of the verb "to be" and the present participle, or "-ing" form of an action verb, generally indicates continuing action. *See id.* For instance, one may use the present tense as follows: She *is opening* the store as we speak. One may also properly say: She *is opening* the store at ten o'clock every week. *See id.* The first example describes contemporaneous action; the second, recurring action. Thus, when Congress barred protester interference because a clinic "*is providing*" health services, the most natural reading is that it meant to prohibit not just interference prompted by abortions *in process* but also interference prompted by abortions provided on a recurring or continuing basis.

Our interpretation that section 248(a)(1) prohibits interference motivated both by present and by future provision of services finds support when we look, as *Grammatico* instructs, to the provisions of the whole law. For instance, the Act prohibits *intimidation* of those seeking to provide or obtain reproductive health services, and Balint concedes that this prohibition protects the future provision of reproductive health services. Appellant's Br. at 9. This prohibition demonstrates that Congress's intent was not limited to past and present abortions. (Congress appended no express temporal modifier to its *intimidation* prohibition, as it did to its *interference* prohibition, because the act of intimidation is inherently focused on the future activity of another. Thus, *intimidation* has a limited temporal application, whereas *interference* does not.) Looking to another provision, the Act allows civil suits by persons "involved in providing or seeking to provide, or obtaining or seeking to obtain services in a facility that provides reproductive health services." 18 U.S.C. § 248(c)(1)(A). This provision demonstrates concern for *present* clinic activity by extending standing to those "involved in" providing services and those "obtaining" services. It demonstrates concern for *future* clinic activity by extending standing to those "seeking to" provide or "seeking to" obtain services. In sum, the law as a whole clearly bars obstruction motivated by past, present and future provision of reproductive health services. In section 248(a)(1), at issue here, Congress expressed its intent economically, using the words "is obtaining or providing" to indicate both present and ongoing provision or use of services. We have discretion to adopt a restricted meaning of a word where the literal meaning would be ab-

surd. *Chicago Transit Auth.*, 607 F.2d at 1289–90. Here, we decline to adopt a restricted meaning because it would lead to absurd results. Were we to insulate Balint from liability merely because he managed to park the offending car before the clinic was open for business, we would permit him to shutter the clinic and thereby interfere with numerous abortions and other medical appointments. In light of Congress's intent, this is an absurd result, and one we decline to reach.

 Having interpreted the statute, we must review the trial judge's application of it to Balint. We review challenges to the sufficiency of the evidence by viewing the evidence in the light most favorable to the prosecution and asking whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Torres*, 191 F.3d 799, 807 (7th Cir.1999). According to our interpretation of the Access Act, if Balint interfered with the Wisconsin Women's Health Care Center because it was providing at the time of his protest or was providing on a continuing basis reproductive health services, he violated the Act. Judge Randa concluded that Balint and the others were motivated by a desire to protect "pre-born babies" who might be aborted as part of the clinic's continuing provision of services. Viewing the evidence—the defendants' concession that they wanted to protect fetuses, Balint's commitment to the pro-life cause and the Clinic's notoriety as an ongoing provider of abortion services—we cannot call the trial court's finding on this element irrational. The evidence on this element was sufficient.

B. Due Process and Vagueness

 Balint next argues that the vagueness of the Access Act violates due process by depriving him of "fair warning" that his conduct was prohibited by law. The magistrate judge rejected Balint's motion to dismiss on this basis. The trial court did not act on the motion when Balint renewed it at the trial level. We review this question of law *de novo*. *United States v. Wilson*, 154 F.3d 658, 662 (7th Cir.1998).

 Balint bases his due process "fair warning" challenge solely on the Supreme Court's decision in *United States v. Lanier*, 520 U.S. 259, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997). The Court in *Lanier* stated that a criminal defendant has a due process right to a "fair warning" that his conduct violates the law. *See id.* at 265, 117 S.Ct. 1219. This "fair warning" requirement applies in three contexts: (1) where a statute " 'forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application,' " *id.* at 266, 117 S.Ct. 1219 (quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926)); (2) where a criminal statute is ambiguous, triggering the so-called rule of lenity which requires resolving the ambiguity strictly to apply only to conduct clearly covered; *Lanier*, 520 U.S. at 266, 117 S.Ct. 1219 (citing *Liparota v. United States*, 471 U.S. 419, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985)); and (3) where a court "applies a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Lanier*, 520 U.S. at 266, 117 S.Ct. 1219 (citing *Marks v. United States*, 430 U.S. 188, 191–92, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977)).

 Balint tells us that the application of the Access Act to his conduct raises "fair warning" problems in all three contexts. But vagueness is a condition precedent to a "fair warning" challenge. A statute is unconstitutionally vague if it does not give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). The Access Act has withstood numerous vagueness challenges.[1] Balint does not specify how his

---

1. *See, e.g., Terry v. Reno*, 101 F.3d 1412, 1421 (D.C. Cir.1996) ("interfere with" and "intimi- date" clear); *United States v. Soderna*, 82 F.3d 1370, 1376–77 (7th Cir.1996) (meaning of

vagueness challenge differs from those previously rejected. We infer from his sufficiency of the evidence argument he finds the motive element of the Access Act vague, and that issue is one of first impression. As discussed above, we find the statute straightforward. Balint ignored the common understanding of the present progressive tense used by Congress to indicate continuing—*i.e.* present and future—activities. But the plain language as people of ordinary understanding would read it barred interference motivated by past, present or future clinic activity. For this reason, the vagueness required to sustain any version of the *Lanier* challenge is missing.

In *Lanier*, a state judge who had sexually assaulted several women was accused of violating a federal criminal statute that barred state officials from willfully depriving persons of "rights protected by the Constitution or laws of the United States." *Lanier*, 520 U.S. at 264, 117 S.Ct. 1219. In analyzing whether application of this vague language to the judge violated fair warning, the Supreme Court noted that "constitutional difficulty does not arise when the accused is charged with violating a 'right which has been made specific ... by the express terms of the ... laws of the United States.'" *Id.* at 267, 117 S.Ct. 1219 (quoting *Screws v. United States*, 325 U.S. 91, 104, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945)). The right of abortion providers and their clients to have access to clinics is specifically identified by the express terms of the Act. The language is not vague in the least. It bars interference with people because they have in the past provided or used abortion services or because they are doing so currently or on a recurring basis. Balint's attempt to evade the restriction on interference with "present" abortion services by initiating his illegal conduct at 5:30 a.m., when the clinic was closed, rather than at 7 a.m., when the clinic was scheduled to open, does not in itself render the statute vague.

] Balint proposes that, even if the statute is not vague enough to offend the Constitution, it is vague enough to trigger the rule of lenity, which would force us to apply the narrower version of the Act against him. But the rule of lenity "comes into play only 'when choice has to be made between two readings of what conduct Congress has made a crime.'" *United States v. Lowe*, 860 F.2d 1370, 1376 (7th Cir.1988) (quoting *United States v. Bass*, 404 U.S. 336, 350, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971)). The rule of lenity is unavailable to us if the purported ambiguity in a statute can be resolved through normal methods of statutory construction. *Chapman v. United States*, 500 U.S. 453, 463, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991); *United States v. Carr*, 965 F.2d 176, 178–79 (7th Cir.1992). As recounted above, the plain language of the statute construed to effect the intent of the drafters leaves us no choice regarding the conduct Congress has criminalized. It has barred interference motivated by both current and recurrent provision of abortion services, and the rule of lenity does not apply.

 Finally, Balint contends that, even if we find that the Access Act prohibits his conduct, such a finding would be "novel" because we would be the first court to construe the motive element. Applying a novel legal theory to affirm his conviction, he protests, would violate his due process rights. *See, e.g., Marks*, 430 U.S. at 191–92, 97 S.Ct. 990; *see also Bouie v. City of Columbia*, 378 U.S. 347, 354, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964). But we withhold application of "novel" interpretations only if those interpretations amount to an unpredictable shift in the law. *See United States v. Killion*, 30 F.3d 844, 846 (7th Cir.1994). Due process does

---

"unreasonably obstruct" clear); *United States v. Dinwiddie*, 76 F.3d 913, 924 (8th Cir.1996) ("interfere with," "intimidate," "force or threat of force," "injuries," "physical obstruc-

tion" clear); *Cheffer v. Reno*, 55 F.3d 1517, 1521 (11th Cir.1995) (same); *American Life League, Inc. v. Reno*, 47 F.3d 642, 653 (4th Cir.1995) (same).

not require insulating defendants when our decision merely clarifies the meaning of a statute. *See id.* Moreover, our interpretation of the Access Act is not at all unpredictable. It follows plainly from the language of the statute. Balint cannot complain about the lack of court guidance available in 1994, when the statute itself was sufficient to advise him his acts were criminal. We reject Balint's arguments, both as applied to him and as applied to Ketchum, who has adopted them on appeal.

## C. Jury Trial

■■■■ Ketchum appeals his conviction on the basis that Judge Randa violated his Sixth Amendment right by denying him a jury trial. The penalties for an exclusively nonviolent physical obstruction, if a first offense as here, are a maximum $10,000 fine and a maximum six month imprisonment, or both. 18 U.S.C. § 248(b)(1). The judge denied Ketchum's request for a jury trial on the basis that his offense was "petty." Although the Sixth Amendment states flatly that "[i]n all criminal prosecutions, the accused shall enjoy the right to a ... trial by an impartial jury," the Supreme Court has for more than a century recognized that the jury trial right does not attach to prosecutions for petty offenses. *See, e.g., Callan v. Wilson,* 127 U.S. 540, 8 S.Ct. 1301, 32 L.Ed. 223 (1888); *Muniz v. Hoffman,* 422 U.S. 454, 475–76, 95 S.Ct. 2178, 45 L.Ed.2d 319 (1975). Is a first-time, nonviolent violation of the Access Act a petty offense? This court discussed the question at length in *United States v. Soderna,* 82 F.3d 1370, 1377–80 (7th Cir.1996), and answered yes. *Soderna* involved a scenario identical to the one we confront today, complete with jerry-rigged autos and a painstaking extrication ordeal. *Id.* at 1373. Counsel has presented no distinguishable facts or intervening caselaw that warrant reconsideration of our decision in *Soderna.* Therefore, we will not revisit *Soderna's* holding that a first-time, nonviolent violation of the Access Act is not a "serious" offense. Ket-

chum's offense was "petty," and he was not entitled to a jury trial.

## D. Restitution

■■■ Ketchum and Balint appeal the district judge's order that all six defendants pay restitution of $1,759.04 to the City of Milwaukee for its expense in dismantling the auto blockades. We will not reach the merits of this issue, as it became moot when codefendant Michael Skott paid the restitution bill in full.

■■■■ "A case is moot if there is no possible relief which the court could order that would benefit the party seeking it." *In re Envirodyne Indus. Inc.,* 29 F.3d 301, 303 (7th Cir.1994) (citing *Church of Scientology v. United States,* 506 U.S. 9, 11, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992)). A case presenting a live controversy before the trial court may be mooted on appeal by some intervening event. *See McKinney v. Indiana Michigan Power Co.,* 113 F.3d 770, 772 (7th Cir.1996). The intervening event here is Skott's full payment of the restitution. Even if the trial court erred in ordering the six original defendants to repay the city, our stating so would provide no relief to Balint and Ketchum. We cannot relieve them of an obligation that has already been extinguished by another party. *See, e.g., Union of Professional Airmen v. Alaska Aeronautical Indus., Inc.,* 625 F.2d 881, 884 (9th Cir.1980) (finding that where employer and its president were ordered to pay civil contempt fine and employer paid full fine, president's appeal of fine on his own behalf was moot). And we cannot order the City to refund to these defendants money that one of their colleagues paid. *Compare, e.g., Corley v. Rosewood Care Center, Inc.,* 142 F.3d 1041, 1058 (7th Cir.1998) (payment of litigation sanctions do not moot appeal because appellate court can order a refund to payor).

This result follows not just from logical application of the mootness doctrine to these facts, but from the Victim and Witness Protection Act (VWPA), which autho-

rized the restitution order in this case. 18 U.S.C. § 3663. The VWPA specifically analogizes restitution orders with civil judgments, directing that they be enforced in the manner provided by 18 U.S.C. § 3613. 18 U.S.C. § 3663(d). Section 3613 allows the United States to enforce judgments imposing fines by the same method as civil judgments. 18 U.S.C. § 3663(d). It is well settled that "if a codefendant satisfies a judgment, appeals are mooted as between the plaintiff and any other defendant . . . ." 13A CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3533.2, at 246 (2d ed.1984). *See e.g. Schiller v. Penn Central Trans. Co.*, 509 F.2d 263, 266 (6th Cir.1975) (satisfaction of judgment by joint tortfeasor mooted defendant's appeal of procedural ruling in favor of plaintiff; cross-appeal between defendants still alive). Thus, because codefendant Skott satisfied the restitution order, the appeal of that order by these codefendants is mooted.[2]

### III. CONCLUSION

In sum, we reject Balint's interpretation of the Access Act's motive requirement, and find that the government presented sufficient evidence from which the trial court could find he had the requisite motive. Further, we reject Balint's arguments that the Access Act is unconstitutionally vague and failed to give him notice of the likelihood of arrest. Because we reaffirm our holding in *Soderna*, we affirm the trial court's denial of a jury trial to Ketchum. And we decline to review Balint and Ketchum's challenge to the trial court's restitution order because in light of

the full payment to the City of Milwaukee, that issue is no longer a live controversy. The judgments of the district court convicting Balint and Ketchum and denying Ketchum a jury trial are AFFIRMED. The appeal of the restitution order is DISMISSED.

**2.** It is irrelevant whether the United States or the City of Milwaukee is put in the shoes of the civil plaintiff. The payment satisfied the United States's penal goals and satisfied the City of Milwaukee's compensatory goals. Thus, in no scenario is there a dissatisfied "plaintiff" as required to keep this issue alive. Of course, Skott can sue Balint and Ketchum for contribution if he likes. *See, e.g., Kafka v. Pope*, 194 Wis.2d 234, 242, 533 N.W.2d 491, 494 (1995). Although payment of a judgment may moot the case between plaintiff and non-

paying codefendants, "[i]ssues between the defendants may remain alive." WRIGHT, MILLER & COOPER at § 3533.2; *see also Schiller v. Penn Central Trans. Co.*, 509 F.2d 263, 266 (6th Cir.1975). However, the defendants' vulnerability to a future civil suit for contribution by a third party not before us does not preserve *this* appeal. "A case or controversy must be present at every moment of the litigation. That's the point of the mootness doctrine . . . ." *United States v. Accra Pac, Inc.*, 173 F.3d 630, 633 (7th Cir.1999).