**UNITED STATES of America,**
**Plaintiff,**

v.

**Roberto RODRIGUEZ, Defendant.**

**No. IP 05–0491–M–01.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

March 7, 2006.

## ENTRY ON PRELIMINARY HEARING

FOSTER, United States Magistrate Judge.

This cause comes before the Court for a Fed.R.Crim.P. 5.1 preliminary hearing on the issue of probable cause. The defendant, by his then-counsel, William H. Dazey, Jr. of the Federal Community Defender's Office, filed a "Memorandum on Preliminary Examination" (doc. no. 5) ("Defendant's Brief"), and the government, by Assistant United States Attorney James P. Hanlon, filed its response thereto (doc. no. 7) ("Government's Brief"). After continuances, a hearing was held on February 2, 2006 before the undersigned magistrate judge. The defendant appeared in person and by retained counsel, Kenneth L. Riggins. The government appeared by Mr. Hanlon. Robert D. Townley, Special Agent with the United States Postal Service, Office of Inspector General ("OIG"), also appeared and testified. After the hearing, the parties were offered an opportunity to submit supplemental filings and the defendant did so on February 13, 2006 (doc. no. 14). After considering the parties' written and oral arguments, the hearing and supplemental evidence, and the underlying papers in the file including Special Agent Townley's affidavit in support of the warrant, the Court finds and concludes that there is not probable cause supporting the prosecution of the defendant.

On December 29, 2005, the government filed a criminal complaint charging that the defendant, Roberto J. Rodriguez, "did Possess firearms and dangerous weapons in a Federal facility in violation of Title 18, United States Code, Section 930(a)." Criminal Complaint (doc. no. 1). The government sought and received an arrest warrant which was executed on January 4, 2006. Special Agent Townley's affidavit provided the government's factual support for the complaint and the warrant application. On August 3, 2005, the OIG began an investigation of Mr. Rodriguez, a Postal Service employee at the time, based on an anonymous tip that he was involved in the use and distribution of narcotics on Postal Service property. On November 10, 2005, at approximately 12:10 a.m., Mr. Rodriguez' vehicle was parked in the employee parking lot of the Postal Service's Indianapolis Processing and Distribution Center ("PDC") at 125 West South Street in Indianapolis, Indiana. The lot is clearly marked as Postal Service property and is surrounded with a chain-link fence that is topped with razor wire.

Special Agent Townley and other law enforcement officers had an Indianapolis Police Department canine unit that is specially-trained to alert to the scent of narcotics sniff the exterior of Mr. Rodriguez' vehicle and the dog alerted to the scent of narcotics. Mr. Rodriguez accompanied officers to his vehicle and provided verbal and written consent for a search of his vehicle. The officers recovered the follow-

ing items from its interior: one loaded .40 caliber handgun, one loaded pistol-grip 12–gauge shotgun, 447 rounds of various ammunition, one "Stun Master 300–S" stun gun, 46 M–150 explosives, handcuffs, and one black ski mask.

The affidavit goes on to state that, on September 3, 1996 and September 2, 1997, Mr. Rodriguez received and signed the Postal Service policy on firearms in the workplace. That policy states, in part:

> [I]t is well established that postal policy and federal law prohibit the possession of a firearm within postal installations. In order to ensure the effective and uniform application of that prohibition, the bringing, storing, or in any way possessing of a firearm within postal installations is cause for immediate removal from postal employment without regard to past record or other elements of progressive discipline . . . .

During new employee training on or about September 2, 1997, Mr. Rodriguez was given notice that firearms and dangerous weapons are prohibited on Postal Service property. Training staff showed and explained Postal Service Poster 158, which states:

> Possession of Firearms and Other Dangerous Weapons on Postal Property is Prohibited By Law 18 U.S.C. Section 930. Possession of Firearms and Dangerous Weapons in Federal Facilities (a) Except as provided in subsection (C), whoever knowingly possesses or causes to be present a firearm or other dangerous weapon in a federal facility, or attempts to do so, shall be fined under this

title or imprisoned not more than 1 year, or both . . . .

This poster is conspicuously posted at the PDC.

During the hearing, Special Agent Townley provided additional facts. The employee parking lot in which Mr. Rodriguez' vehicle was parked is situated in the block immediately south of the PDC with a public street and adjacent public sidewalks running between them.[1] The employee parking spaces are on the southern end of the block. On the northern end of the block, lying between the employee parking spaces and the public street and the PDC, is a vehicle maintenance facility ("VMF") consisting of a large building and surrounding area that includes some parking space. This vehicle-maintenance area is separated from the employee parking spaces by a chain-link fence running east and west. Special Agent Townley did not know if this section of fence is topped by razor wire. However, the perimeter of the entire lot, encompassing the employee parking spaces on the south and the vehicle-maintenance area on the north, has a chain-link fence topped with razor wire. Mr. Rodriguez' vehicle was parked at the southern end of the employee parking area; Special Agent Townley guessed that the vehicle was 150 to 200 yards from the PDC.

Special Agent Townley testified that signs are posted at each of the public entrances to the PDC prohibiting the carrying of firearms and dangerous weapons into the PDC but he was unaware whether similar signs were posted at each of the employee entrances to the PDC or at the

---

1. The employee parking lot appears to be bounded by Capitol Avenue on the west, Merrill Street on the north (the street between the PDC and the lot), and Illinois Street on the east. It is unknown whether the lot extends as far as McCarty Street on the south. Neither Mr. Rodriguez nor the government was able to advise the Court as to whether the Postal Service owned or leased the employee parking lot. Mr. Rodriguez' supplemental submission attached a document which he asserted indicated that the property is privately owned but the document's source was not identified.

VMF. He also testified that Postal–Service employees are regularly present in the employee parking lot as they arrive for and depart from work in their vehicles and walk to and from the PDC. The government introduced, and the Court admitted without objection, Government's Exhibit 1 purporting to be two photographs of signs posted at the employee parking lot clearly designating the lot as United States Postal Service property reserved for Postal Service personnel.

Fed.R.Crim.P. 5.1 provides, in relevant part:

> **(a) In General.** If a defendant is charged with an offense other than a petty offense, a magistrate judge must conduct a preliminary hearing unless:
>
>> (1) the defendant waives the hearing;
>>
>> (2) the defendant is indicted;
>>
>> (3) the government files an information under Rule 7(b) charging the defendant with a felony;
>>
>> (4) the government files an information charging the defendant with a misdemeanor; or
>>
>> (5) the defendant is charged with a misdemeanor and consents to trial before a magistrate judge.

Fed.R.Crim.P. 5.1(a).[2] Mr. Rodriguez did not waive the hearing; the offense with which he is charged, 18 U.S.C. § 930(a), is a misdemeanor; and, to date, the government has filed only the Complaint against Mr. Rodriguez. In the circumstances, therefore, a preliminary hearing is mandatory.

Rule 5.1 provides the substantive standard to be applied at a preliminary hearing: "If the magistrate judge finds probable cause to believe an offense has been committed and the defendant committed it, the magistrate judge must promptly require the defendant to appear for further proceedings. * * * If the magistrate judge finds no probable cause to believe an offense has been committed or the defendant committed it, the magistrate judge must dismiss the complaint and discharge the defendant." Fed.R.Crim.P. 5.1(e) and (f).

> Probable cause has been defined as "facts and circumstances 'sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" The rule of probable cause is a "practical, nontechnical conception" that affords the "best compromise" between the interests of individual liberty and effective law enforcement. Contrary to what its name might seem to suggest, probable cause "demands even less than 'probability,'"; it "requires more than bare suspicion but need not be based on evidence sufficient to support a conviction, nor even a showing that the officer's belief is more likely true than false."

*Woods v. City of Chicago,* 234 F.3d 979, 996 (7th Cir.2000) (citations omitted). The purpose of a preliminary hearing is to afford the accused an opportunity to challenge the existence of probable cause to hold him for trial. *United States v. Foster,* 440 F.2d 390, 392 (7th Cir.1971). Therefore, unlike the *ex parte* probable-cause determinations that a judge makes when reviewing warrant applications, Fed. R.Civ.P. 41, and that the Fourth Amendment requires after the warrantless arrest of a suspect, *Gerstein v. Pugh,* 420 U.S. 103, 120, 95 S.Ct. 854, 866, 43 L.Ed.2d 54 (1975), the Rule 5.1 probable-cause determination is an adversarial proceeding where the defendant may have the assis-

---

**2.** Neither Mr. Rodriguez nor the government raised any issue regarding the timing of the hearing. See Fed.R.Crim.P. 5.1(c).

tance of counsel, cross-examine the government's witnesses, introduce his own evidence, and present his legal arguments directly to the judge, Fed.R.Crim.P. 5.1(e). Under Rule 5. 1, the magistrate judge makes a *de novo* determination of probable cause based on the facts and circumstances as they exist and are presented at the time of the preliminary hearing and for the purpose of determining only whether the accused may be held to answer at trial; the preliminary hearing does not consider whether probable cause supported the issuance of an arrest warrant or whether officers had probable cause at the time of an arrest, inquiries for which a less-stringent standard of probable cause accommodates the different contexts of facts, circumstances, and balancing of interests that occur at the time those decisions are made. *See, e.g., Gerstein,* 420 U.S. at 112, 95 S.Ct. at 862 (reasonable margins of error are allowed for arresting officers confronting ambiguous circumstances); *Williams v. Kobel,* 789 F.2d 463, 468–69 (7th Cir.1986).

Mr. Rodriquez is charged with violation of 18 U.S.C. § 930(a):

> Except as provided in subsection (d), whoever knowingly possesses or causes to be present a firearm or other dangerous weapon in a Federal facility (other than a Federal court facility), or attempts to do so, shall be fined under this title or imprisoned not more than 1 year, or both.

The statute defines "Federal facility:"

> The term "Federal facility" means a building or part thereof owned or leased by the Federal Government where Federal employees are regularly present for the purpose of performing their official duties.

18 U.S.C. § 930(g)(1). The statute also conditions violation on the posting of notices:

> Notice of the provisions of subsections (a) and (b) shall be posted conspicuously at each public entrance to each Federal facility, and notice of subsection (e) shall be posted conspicuously at each public entrance to each Federal court facility, and no person shall be convicted of an offense under subsection (a) or (e) with respect to a Federal facility if such notice is not so posted at such facility, unless such person had actual notice of subsection (a) or (e), as the case may be.

18 U.S.C. § 930(h).[3]

Mr. Rodriguez contends that the plain and ordinary meaning of "a building or part thereof" in the definition of "Federal facility" does not include a parking lot that is separated from the building in question by a public street and chain-link fencing. In addition, he argues that the statute prohibits possession of a firearm "in" a Federal facility, which suggests an enclosed space, not "on" a Federal facility, which might, absent the statute's definition, suggest an unenclosed space such as a parking lot. The government argues that the Court should "construe 18 U.S.C. § 930(a) broadly and consistent with its purpose, *i.e.*, to protect federal facilities and employees from violence." (Govern-

---

**3.** Subsection (b) of § 930 provides stiffer penalties (fine and/or imprisonment for not more than 5 years) if a person possesses or causes to be present in a Federal facility a firearm or dangerous weapon with intent that it be used in the commission of a crime. The government charged Mr. Rodriguez with only possession under subsection (a).

Subsection (e) prohibits the possession or the causing to be present a firearm in a Federal court facility, defined as "the courtroom, judges' chambers, witness rooms, jury deliberation rooms, attorney conference rooms, prisoner holding cells, offices of the court clerks, the United States attorney, and the United States marshal, probation and parole offices, and adjoining corridors of any court of the United States." 18 U.S.C. § 930(g)(3).

ment's Brief, p. 2). In its brief, the government concedes that the employee parking facility is "obviously not a building", (*id.*, p. 4), but contends that it nonetheless falls under the statute's reach because it is "part of the United States Postal Service Indianapolis Processing and Distribution Center. It is separated from public access by physical barriers, such as fences and razor-wire, and posted notices identifying it as Postal Service property" and federal employees are regularly present on the lot for the purpose of performing their duties, (*id.*). The government did not repeat the concession at hearing but argued generally that a broad meaning should be given to the definition of "Federal facility," without distinguishing its parts, in order to include the employee parking lot. Thus, while Mr. Rodriguez emphasizes the limits of the "building" term of the definition of "Federal facility", the government can be understood to be stressing the expansiveness of the "part of" term. According to the government, it would be consistent with the purpose of § 930 to broadly construe the definition of "Federal facility" to include the employee parking lot because it is "part of" the PDC. Such an interpretation would also be consistent with the more stringent Postal Service regulation, 39 C.F.R. § 232.1, of which Mr. Rodriguez was informed during his training. The government also points out that Mr. Rodriguez was given "actual notice" of the provisions of § 930(a) contemplated by § 930(h) despite the absence of notifying signs at the entrances to the employee parking lot.

Both sides acknowledge that there are no decisions interpreting § 930(g)(1)'s term "building or part thereof" and neither side presented any legislative history reflecting Congress' intent regarding the definition of the term. The government urges the Court to reject the poor draftsmanship of § 930(g)(1) and to construe the language broadly in accord with the purpose of § 930(a), which is readily ascer-

tainable from the definition of "Federal facility:" to protect federal facilities and employees from violence.

■ The rules for statutory construction are well-established:

The cardinal rule of statutory interpretation is that courts "must first look to the language of the statute and assume that its plain meaning accurately expresses the legislative purpose". In determining whether the meaning of statutory language is plain or ambiguous, we look to the specific language at issue, the context in which the language is used, and the broader context of the statute as a whole. We will not construe a statute in a way that makes words or phrases meaningless, redundant, or superfluous.

*United States v. Miscellaneous Firearms, Explosives, Destructive Devices and Ammunition,* 376 F.3d 709, 712 (7th Cir.2004) (citations omitted), *cert. denied,* 544 U.S. 1019, 125 S.Ct. 1999, 161 L.Ed.2d 859 (2005). Courts should give the words of a statute their ordinary and common-sense meanings, *Lara–Ruiz v. Immigration and Naturalization Service,* 241 F.3d 934, 940 (7th Cir.2001), but because statutes are to be read and interpreted as a whole, the plain and ordinary meaning of a term must be informed by context and the overall statutory scheme, *Reno v. Koray,* 515 U.S. 50, 56, 115 S.Ct. 2021, 2025, 132 L.Ed.2d 46 (1995) ("it is a 'fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used.' ").

■ If the words of a statute have established common-law or criminal-law meanings, then courts will presume that Congress intended the words to have those established meanings absent clear evidence to the contrary. *See Salinas v.*

*United States,* 522 U.S. 52, 63, 118 S.Ct. 469, 476–77, 139 L.Ed.2d 352 (1997); *Guerrero–Perez v. Immigration and Naturalization Service,* 242 F.3d 727 (7th Cir. 2001) (statute included its own definition of "aggravated felony" which encompassed offenses that are commonly classified as misdemeanors). Interpretations that render other statutory provisions superfluous should be rejected, *United States v. Alvarenga–Silva,* 324 F.3d 884, 887 (7th Cir. 2003); *Ranum,* 96 F.3d at 1030, even if the "additional work" that the other provisions perform is slight or the provisions serve to emphasize Congressional concerns, *Scheidler v. National Organization for Women, Inc.,* — U.S. ——, ——, 126 S.Ct. 1264, 1273, 164 L.Ed.2d 10, (2006).

▬▬ Courts will look beyond the text of a statute only when the meaning of the language is not plain, the statutory context or structure as a whole reveals an ambiguity, or giving effect to the plain meaning will lead to illogical and absurd results. *Conroy v. Aniskoff,* 507 U.S. 511, 514, 113 S.Ct. 1562, 1565, 123 L.Ed.2d 229 (1993).[4] A court may delve into a statute's history or expressions of legislative intentions only in exceptional cases. Several related doctrines underlie this rule. First, courts have a duty to give effect to the plain meaning of statutes as they are written if the language is clear and unambiguous. *United States v. Balint,* 201 F.3d 928, 932 (7th Cir.2000) ("When we interpret a statute, we look first to its language. If that language is plain, our only function is% 7F" 'to enforce it according to its terms.' "); *Ranum,* 96 F.3d at 1029. Second, as op-posed to the selective and often-contradictory character of statements of legislative intent,[5] there is a "strong presumption ' "that the legislative purpose is expressed by the ordinary meaning of the words used," ' " *Ardestani v. Immigration and Naturalization Service,* 502 U.S. 129, 112 S.Ct. 515, 520, 116 L.Ed.2d 496 (1991) ("The 'strong presumption' that the plain language of the statute expresses congressional intent is rebutted only in 'rare and exceptional circumstances,' when a contrary legislative intent is clearly expressed."); *Monterey Coal Co. v. Federal Mine Safety and Health Review Commission,* 743 F.2d 589, 595–96 (7th Cir.1984) ("the language of the statute is the most reliable indicator of congressional intent. It is the language which is chosen with the most care, subjected to the greatest scrutiny and actually voted on by Congress and signed by the President. Excessive deference to the comments of one legislator … may undermine the intent of Congress as expressed in the statute and might permit those who have lost in the Congress to prevail in the courts."). If the text of a statute is plain and unambiguous, legislative history and intentions may be examined only on a showing that giving effect to the plain meaning will frustrate Congress' clear intention or lead to patently absurd results. *Balint,* 201 F.3d at 932–33 ("The plain meaning of a statute is conclusive unless "literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.' " … Further, we may adopt a restricted rather than a literal meaning of a word where

---

**4.** Not every imaginable alternative interpretation will render statutory language ambiguous. *Salinas,* 522 U.S. at 60, 118 S.Ct. at 475 ("A statute can be unambiguous without addressing every interpretive theory offered by a party."); *United States v. Ranum,* 96 F.3d 1020, 1030 (7th Cir.1996), *cert. denied,* 519 U.S. 1094, 117 S.Ct. 773, 136 L.Ed.2d 718 (1997) ("nor do we believe that ambiguity may be found (and the rule of lenity invoked) whenever a creative appellant is able to posit possible alternative meanings for statutory language, no matter how tenuous or improbable").

**5.** *See Conroy v. Aniskoff,* 507 U.S. 511, 518–28, 113 S.Ct. 1562, 1567–72, 123 L.Ed.2d 229 (1993) (J. Scalia concurring).

acceptance of the literal meaning would lead to absurd results."); *Ranum*, 96 F.3d at 1029. The standard for favoring legislative intent over the plain meaning of a statute is a high one: "the plainer the statutory language, the more explicit, convincing and reliable the contrary legislative history must be to persuade a court to follow the indications in the legislative history". *Monterey Coal Co.*, 743 F.2d at 595.[6] If the meaning of a statutory provision is ambiguous on its face or the plain and ordinary meaning would lead to patently absurd results, and either rejecting the absurd alternate interpretations or examining the statutory context and structure as a whole does not result in a clarified meaning, then legislative history and intent may be consulted to inform the meaning of statutory language. *See Miscellaneous Firearms*, 376 F.3d at 712; *United States v. Turcotte*, 405 F.3d 515, 522–23 (7th Cir.2005), *cert. denied*, —— U.S. ——, 126 S.Ct. 1022, 163 L.Ed.2d 853, 2006 WL 37069 (Jan. 09, 2006).

The fair warning requirement of the Fifth Amendment provides a constitutional check on the results of statutory interpretation. *United States v. Lanier*, 520 U.S. 259, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997). *Lanier* described three manifestations of the doctrine:

> First, the vagueness doctrine bars enforcement of "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." Second, ... the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered. Third, although clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute, due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope. In each of these guises, the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal.

*Lanier*, 520 U.S. at 266, 117 S.Ct. at 1225 (citations omitted). *Balint*, 201 F.3d at 934. The fair warning requirement likely limits how far a court may stray from the plain and ordinary meaning of statutory terms in order to accommodate a legislative intent that is discernable only from an investigation of the legislative record.

These well-established rules of statutory construction are strictly applied when interpreting criminal statutes.

It has been long settled that "penal statutes are to be construed strictly," and that one "is not to be subjected to a penalty unless the words of the statute

---

**6.** *But see Alvarenga–Silva, supra.* Interpreting a provision of the Sentencing Guidelines in *Alvarenga–Silva*, the Court of Appeals rejected evidence of the Sentencing Commission's intentions which contradicted the plain and ordinary meaning of the text:

> [W]e cannot rely on interpretations of the Commission's intent because the language of the definition, as drafted, leaves no ambiguity.... [I]f our reading is indeed at odds with the Commission's apparent intent in amending § 2L1.2 to provide more graduat-

ed increases for different types of offenses, it must be left to the Commission to clarify or redraft § 2L1.2 to achieve the desired result.

*Alvarenga–Silva*, 324 F.3d at 888. General rules of statutory construction govern courts' interpretations of the Sentencing Guidelines, *United States v. Mitchell*, 353 F.3d 552, 556 (7th Cir.2003), although they might be applied less-deferentially to the Guidelines than to statutes, *United States v. Jordan*, 890 F.2d 968, 972 (7th Cir.1989).

plainly impose it. "When choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *United States v. Campos–Serrano,* 404 U.S. 293, 297, 92 S.Ct. 471, 474, 30 L.Ed.2d 457 (1971) (citations omitted). *Salinas,* 522 U.S. at 57–58, 118 S.Ct. at 474 (courts may depart from the plain and ordinary meaning of criminal statutes in only rare and extraordinary circumstances). The mandate of the rule of lenity is that ambiguities in criminal statutes must be resolved in favor of the accused and its function is to ensure that fair warning is given of what the law requires, that no person be at risk of criminal sanction and opprobrium unless Congress clearly and unmistakably defines the actions prohibited or required. *Campos–Serrano,* 404 U.S. at 297, 92 S.Ct. at 474; *United States v. Pitt–Des Moines, Inc.,* 168 F.3d 976, 984 (7th Cir. 1999); *United States v. Vang,* 128 F.3d 1065, 1072 (7th Cir.1997) (concerns of fair notice and arbitrary enforcement animate the rule of lenity), *cert. denied,* 522 U.S. 1140, 118 S.Ct. 1107, 140 L.Ed.2d 160 (1998). Neither every proposed or possible ambiguity or alternative interpretation nor split of judicial interpretations trigger the rule of lenity; instead, there must be "a grievous ambiguity or uncertainty in the language and structure of the Act", *Ranum,* 96 F.3d at 1030, that is unresolved even after textual, historical, and intentional analysis, *Caron v. United States,* 524 U.S. 308, 316, 118 S.Ct. 2007, 2012, 141 L.Ed.2d 303 (1998) ("The rule of lenity is not invoked by a grammatical possibility. It does not apply if the ambiguous reading relied on is an implausible reading of the congressional purpose."); *Koray,* 515 U.S. at 65, 115 S.Ct. at 2029 ("The rule of lenity applies only if, 'after seizing everything from which aid can be derived,' we can make 'no more than a guess as to what Congress intended.' " (citations omitted)); *Moskal v. United States,* 498 U.S. 103, 107–08, 111 S.Ct. 461, 465, 112 L.Ed.2d 449 (1990); *Balint,* 201 F.3d at 935 ("The rule of lenity is unavailable to us if the purported ambiguity in a statute can be resolved through normal methods of statutory construction.").

The interpretive question in the case at bar is whether the employee parking lot on which Mr. Rodriguez' vehicle was parked is "a building or part thereof" as provided in 18 U.S.C. § 930(g)(1). Application of the above principles of statutory construction requires that the Court find that it is not.

 The plain and ordinary meaning of the word "building" does not include a parking lot. This is not only the common understanding of the term but is also the dictionary definition. Black's Law Dictionary defines a building as "[a] structure with walls and a roof, esp. a permanent structure." *Black's Law Dictionary, 8th ed.* (2004). *Webster's Third New International Dictionary of the English Language, Unabridged* (1981) defines a building as "a thing built ... a constructed edifice designed to stand more or less permanently, covering a space of land, usu[ally] covered by a roof and more or less completely enclosed by walls, and serving as a dwelling, storehouse, factory, shelter for animals, or other useful structure—distinguished from structures not designed for occupancy (as fences or monuments) and from structures not intended for use in one place (as boats or trailers) even though subject to occupancy ...." Decisions defining "building" for the purpose of criminal statutes commonly include the elements of walls and a roof and/or enclosure. See, *e.g., Pinkney v. United States,* 380 F.2d 882, 885 (5th Cir.1967), *cert. denied,* 390 U.S. 908, 88 S.Ct. 831, 19

L.Ed.2d 876 (1968) (§ 2113 bank robbery). Although some civil decisions have interpreted "building" broadly, recognizing that the word has varied definitions depending on the statutory context and purpose at issue, and even have found the term ambiguous, see, *e.g.*, *Viad Corp. v. Stak Design, Inc.*, No. 6:04–CV–407, Memorandum Opinion and Order, 2005 WL 894853 (E.D.Texas, April 14, 2005); *Aird v. Aetna Life Ins. Co.*, 27 F.Supp. 141 (W.D.Texas), *jmt. affirmed*, 108 F.2d 136 (5th Cir.1939), no cases were found—and none were presented by the parties—defining the word in a criminal statute so broadly as to include a parking lot.[7]

Even if it were found, in isolation, that the term "building" is ambiguous as to whether it includes a parking lot, the statutory context read as a whole confirms the narrower interpretation. Section 930 also provides:

> Nothing in this section limits the power of a court of the United States to punish for contempt or to promulgate rules or orders regulating, restricting, or prohibiting the possession of weapons within any building housing such court or any of its proceedings, *or upon any grounds appurtenant to such building.*

18 U.S.C. § 930(f) (emphases added). This subsection clearly distinguishes a "building" from the "grounds appurtenant" thereto, a distinction that is does not make sense if the meaning of "building" already includes appurtenant property such as grounds and parking lots. This clear language demonstrates that Congress did not intend the term "building" to include open, unenclosed spaces such as appurtenant grounds or parking lots. Congress knew how to draft language to include grounds and other open, unenclosed spaces when it desired to and it evidently did not desire to in § 930(g)(1).

The government's argument could also be construed to include the proposition that, even if the parking lot is not a "building" under the statutory definition, it nonetheless is a "part" of a building and, therefore, falls within the definition of "Federal facility" under § 930(g)(1). Because this argument was not fully developed on briefing or at hearing, the parameters of what the government contends constitute a "part" of a building, such as to include the parking lot, was not defined. The relationship of appurtenance utilized in § 930(f) cannot be the defining feature because that subsection clearly distinguishes and separates "appurtenant grounds" from the "building" to which they are appurtenant, whereas describing a parking lot as "part" of a building indicates that there is no such distinction or separation, but that the lot is an integrated component of the building itself.[8] Moreover, because the plain and ordinary meaning of a "part" of a subject is that it is a smaller intrinsic unit of the subject itself, not an expansion beyond the

---

7. At the hearing, the government argued that the term "facility" in § 930(a) ("Federal facility") should be broadly construed to include the parking lot. "Facility", in common parlance, does have a broader scope that could encompass the parking lot, and were "facility" to be the operative word in the statute, the Court might very well agree with the government. However, Congress provided a controlling definition of "facility" in § 930(g)(1) that narrows its scope, in part, to "a building or part thereof." It is therefore not the definition of "facility" that is determinative in this case, but the definition of "a building or part thereof."

8. Because the parking lot is distant from the PDC and separated from it by a public street and chain-link fences, the government at hearing suggested that the parking lot could be seen as part of the VMF building to which it was adjacent. For the reasons explained in the text, the "part of" aspect of § 930(g)(1) does not apply to the parking lot even if the government relies on a relationship of adjacency to the VMF instead of appurtenance to the PDC.

defining limits of the subject, the parking lot cannot reasonably be defined as a "part" of the PDC or the VMF.

The government's primary argument is that the Court should interpret the term "building or part thereof" or the primary term "Federal facility" "broadly and consistent with its purpose, *i.e.*, to protect federal facilities and employees from violence." (Government's Brief, p. 2). Because federal employees are regularly present in the employee parking lot, the government contends that it would be consistent with the statute's purpose to protect federal employees from violence, and the stricter provisions of the broader Postal Service regulations, to find that the parking lot is a "federal facility" under the statute. At hearing, the government alluded to the unfortunate incidents of workplace violence by Postal Service employees. While the Court is sympathetic to and shares the government's concern for the safety of federal employees, the language of the statute cannot be stretched so far.

The government relies on a recent district-court decision that interpreted § 930(e)(1) broadly to implement the legislative purpose to better protect federal workers. *United States v. Cabrera*, No. CR S–05–0347 GGH, Order, 2005 WL 3406318 (E.D.Cal. Dec. 12, 2005). The *Cabrera* court confronted § 930's clear textual differences in protections afforded to Federal facilities and Federal court facilities.[9] Section 930(a) prohibits the possession of "a firearm or other dangerous weapon" in a Federal facility but § 930(e)(1) prohibits the possession of only a firearm in a Federal court facility, with no mention of dangerous weapons. The defendant in *Cabrera* entered the Robert T. Matsui Federal Courthouse in Sacramento carrying a cane which the security screens revealed contained a 19–inch

blade. He was charged with violation of § 930(a) but argued that the Matsui Courthouse was a Federal court facility, not a Federal facility, and, because he possessed only a blade and not a "firearm", he could not be in violation of § 930.

The court found that giving effect to § 930(e)(1)'s prohibition against firearms in a court facility but not dangerous weapons was an "absurdity" in the application of the law that permitted it to depart from the plain and ordinary meaning of the statute in favor of implementing what it perceived to be Congress' motivation to provide protection to federal court facilities. The court noted that the pre–1990 version of the statute did prohibit firearms and dangerous weapons in all federal facilities without recognizing any distinction between court and other federal facilities, but that the 1990 amendments that distinguished court facilities inexplicably prohibited only firearms therein. The court described the text enacted by Congress as "poor draftsmanship" that failed to capture Congress' own intention. It looked for evidence that Congress "intended to permit possession of dangerous weapons in a Federal court facility" or that it "desired the citizenry to carry swords, spears, and the like into courtrooms, or didn't care about such" and, finding no such evidence, the court read into § 930(e)(1) the term "or other dangerous weapon."

The Court does not find the *Cabrera* decision to be persuasive. In the first place, after the discussion and holding described above, the court found that the presence of non-judicial offices in the Matsui Courthouse rendered the building a "Federal facility" as defined in § 930(g)(1) to which the broader prohibitions of § 930(a) apply. This straightforward rationale thus supplied a separate and independent ground for the court's decision,

9. Section 930's definition of Federal court facility is quoted in note 3 *supra*.

914

one that obviated the need to venture into statutory construction. Secondly, the *Cabrera* court did not reject the plain and ordinary *meaning* of a term in the statute in favor of a *meaning* suggested by statutory context, legislative history, or legislative intent; instead, it rejected the *term* itself, in favor of additional terms which it felt would be more consistent with the legislative intent. The court found no ambiguity or absurdity in the meaning of the terms as enacted; it found the *absence* of terms to be absurd. Thirdly, rather than look to evidence of legislative intent regarding the meaning of the terms actually enacted, the court relied on a broad, general idea of Congressional motivation to protect the judiciary in order to insert new terms into the statute. Fourth, there was, in fact, no necessary gap in the statute as enacted. Subsection (f) provides that "[n]othing in this section limits the power of a court of the United States to punish for contempt or to promulgate rules or orders regulating, restricting, or prohibiting the possession of weapons within any building housing such court or any of its proceedings, or upon any grounds appurtenant to such building." This subsection authorizes the prohibition of all "weapons"—without the qualifier "dangerous," and obviously encompassing firearms as well—in any building housing a court or on appurtenant grounds—not limited to the statute's restrictive, precise definition of "Federal court facility." Congress thus provided a means for greater protection of the judiciary than even § 930(a) and (e)(1) provided. *Cabrera* went beyond the bounds of legitimate statutory construction into statutory drafting and we find nothing instructive therein. In addition, reading into the statute prohibitions that clearly are not there raises significant Constitutional issues of fair warning which we assume that Congress also intends to avoid.

By its reliance on *Cabrera*, we assume that the government contends that defining "building or part thereof" to not include the employee parking lot would lead to absurd results that are contrary to Congress' intent for § 930. Yet the government presented no evidence of any legislative history or intent for this statute and it did not explain why the results of such an interpretation would be absurd. Finding that the employee parking lot is not a building or a part thereof nonetheless preserves the statute's full protections for federal employees in the PDC and the VMF and, as pointed out by the government, Postal Service regulations are broad enough to cover all postal-service premises including the parking lot. Such an interpretation of § 930(g)(1) might not provide as much protection as the government's proposed construction, but the resulting protection that it does provide can hardly be dismissed as so absurd as to justify rejecting the language's plain and ordinary meaning.

Our duty is to give effect to the words of the statute as written as the best evidence of Congressional intent. We cannot depart from the plain and ordinary meaning of the enacted text based on a general, broad, amorphous—and obvious—motivation by Congress to provide protection to federal employees. And we repeat that neither side presented the high degree of clear, unmistakable expression of a contrary Congressional intent that would justify a different interpretation. Finally, we note that, should we interpret the term "building or part thereof" to include the employee parking lot, a significant Constitutional issue could arise whether the statute gave Mr. Rodriguez fair warning that he was committing a criminal offense.

Because no patent or latent ambiguity has been shown or discovered in the relevant provisions of § 930, the rule of lenity is not applicable.

Therefore, because the "secure employee parking facility of the United States Postal Service Indianapolis Processing and Distribution Center located at 125 W. South Street, Indianapolis, Indiana", as described in ¶7 of the Townley Affidavit attached to and incorporated in the Complaint in this case and further described in the parties submissions and at hearing, is not a "Federal facility" as defined in 18 U.S.C. § 930(g)(1), Mr. Rodriguez' possession of the items described in ¶9 of the Townley Affidavit in his vehicle while parked in the employee parking facility is not a violation of 18 U.S.C. § 930(a) as charged in the Complaint. There being thus no grounds to believe that an offense has been committed, the Complaint must be dismissed and Mr. Rodriguez must be discharged as required by Fed.R.Crim.P. 5.1(f). A separate order shall issue to that effect.

### ORDER OF DISMISSAL AND DISCHARGE

Pursuant to Fed.R.Crim.P. 5.1(f) and for the reasons set forth in the Court's Entry of this date, the Complaint in this case is DISMISSED and the defendant is DISCHARGED.

SO ORDERED.