*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 10a0182p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,

        *Plaintiff-Appellant*,

      *v.*

DAVID BRIAN STONE; JOSHUA MATTHEW STONE; JOSHUA JOHN CLOUGH; MICHAEL DAVID MEEKS; THOMAS WILLIAM PIATEK,

        *Defendants-Appellees*.

No. 10-1618

> Appeal from the United States District Court
> for the Eastern District of Michigan at Detroit.
> No. 10-20123-001—Victoria A. Roberts, District Judge.

Argued: June 8, 2010

Decided and Filed: June 22, 2010

Before: MARTIN, KETHLEDGE, and WHITE, Circuit Judges.

_____

### COUNSEL

**ARGUED:** Kathleen Moro Nesi, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellant. Arthur Jay Weiss, ARTHUR J. WEISS & ASSOCIATES, Farmington Hills, Michigan, James C. Thomas, PLUNKETT COONEY, Detroit, Michigan, Randall C. Roberts, LAW OFFICE, Ann Arbor, Michigan, William W. Swor, LAW OFFICES, Detroit, Michigan, Mark A. Satawa, KIRSCH & SATAWA, P.C., Southfield, Michigan, for Appellees. **ON BRIEF:** Patricia Gaedeke, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellant. Arthur Jay Weiss, ARTHUR J. WEISS & ASSOCIATES, Farmington Hills, Michigan, James C. Thomas, PLUNKETT COONEY, Detroit, Michigan, Randall C. Roberts, LAW OFFICE, Ann Arbor, Michigan, William W. Swor, LAW OFFICES, Detroit, Michigan, Mark A. Satawa, KIRSCH & SATAWA, P.C., Southfield, Michigan, for Appellees.

      MARTIN, J., delivered the opinion of the court, in which KETHLEDGE, J., joined. WHITE, J. (pp. 19-21), delivered a separate opinion concurring in part and dissenting in part.

_____

**OPINION**

_____

BOYCE F. MARTIN, JR., Circuit Judge.   The government appeals the district court's decision to release defendants David Stone, Sr., Joshua Stone, Joshua Clough, Michael Meeks, and Thomas Piatek on bail pending their trial for conspiracy to levy war against or to oppose by force the authority of the United States government and related offenses.   For the reasons set forth below, we **REVERSE** the district court's decision and **REMAND** for further proceedings consistent with this opinion.

**I.**

Over a period of about 18 months, the government investigated defendants, who are members of a group called the Michigan Hutaree.   Members of the Hutaree acquired a significant arsenal of weapons, including components of pipe bombs, and trained as a paramilitary organization.   The Hutaree solicited the assistance of an explosives expert, who was an undercover FBI agent.   After the government obtained information that the Hutaree were planning and preparing for what they referred to as a "real op", which specifically contemplated murdering civilians and law enforcement officers, the FBI brought its evidence before a grand jury.   On March 23, 2010, the grand jury found probable cause to believe that defendants had:  (1) agreed to oppose by force the government and the laws of the United States; (2) attempted to obtain the explosive devices and weapons of mass destruction that would be used to carry out the planned attacks; and (3) used, carried, and possessed firearms in furtherance of these crimes.

In the original indictment,[1] defendants were charged with seditious conspiracy in violation of 18 U.S.C. § 2384 (count one), attempt to use weapons of mass destruction in violation of 18 U.S.C. § 2332a(a)(2) (count two), and two counts of carrying and

_____

[1]On June 2, 2010, the grand jury handed down a superseding indictment in this case.  Because (1) the district court's order was based upon the original indictment and the evidence adduced at the hearing upon the original indictment, and (2) the government has not requested a new bond hearing based upon the superseding indictment—indeed, as of the date of oral argument, defendants had not even been arraigned on the superseding indictment—we restrict our inquiry to the charges as described in the original indictment and the record as was before the district court.

using firearms during and in relation to the crimes of violence charged in counts one and two, as well as possessing firearms in furtherance of those predicate crimes of violence in violation of 18 U.S.C. § 924(c)(1) (counts four and five).[2] David Stone, Sr., was also charged in count three with teaching/demonstrating the use of destructive devices in furtherance of the federal crime of violence charged in count one.

Defendants were arrested over the weekend of March 27-28, 2010, except for Joshua Stone, who was not arrested until the night of March 29, 2010 after a two-day standoff with the authorities. All defendants but Piatek appeared in Detroit for their arraignments and a bond determination on March 30, 2010. After a two-day hearing, the magistrate judge ordered that defendants be detained pending trial. Piatek appeared in the Northern District of Indiana and was ordered detained by a magistrate judge there.

All defendants appealed the detention orders to the district court, which conducted a two-day de novo hearing on April 27-28, 2010. The district court reversed the magistrates' rulings and ordered that defendants be released, subject to specified conditions. The government moved for a stay of the district court's order releasing defendants pending appeal to this court. The district court granted a limited stay, but it then dissolved that stay and again ordered that defendants be released.

The government immediately appealed and also sought a temporary stay of the district court's order pending a review of the merits. A panel of this Court granted a temporary stay on May 10, 2010. At issue now is the order releasing defendants,[3] for whom the government contends that there are no conditions of release that will reasonably assure the safety of the community.

---

[2]Piatek was not charged in count five.

[3]The government originally also appealed the release of defendants David Stone, Jr., Tina Stone, Kristopher Sickles, and Jacob Ward, but it moved to dismiss those claims voluntarily. This Court granted that request on June 2, 2010.

## II.

We review the district court's factual findings for clear error, but we consider mixed questions of law and fact—including the ultimate question whether detention is warranted—de novo.  *United States v. Hazime*, 762 F.2d 34, 37 (6th Cir. 1985).

## III.

Under the Bail Reform Act, 18 U.S.C. § 3142, upheld by the Supreme Court in *United States v. Salerno*, 481 U.S. 739 (1987), a defendant may be detained pending trial only if a judicial officer "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]"  18 U.S.C. § 3142(e).  A judicial officer's finding of dangerousness must be "supported by clear and convincing evidence."  18 U.S.C. § 3142(f)(2)(b).  The default position of the law, therefore, is that a defendant should be released pending trial.

That default is modified, however, for certain, particularly dangerous defendants. Specifically, when a "judicial officer finds that there is probable cause to believe" that a defendant committed one of the crimes listed in section 3142(e)(3), there is a presumption in favor of detention: "Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community[.]"  18 U.S.C. § 3142(e)(3).  A grand jury indictment, by itself, establishes probable cause to believe that a defendant committed the crime with which he is charged. *Hazime*, 762 F.2d at 37. Thus, when the government presents an indictment including charges listed in section 3142(e)(3), it has fulfilled its burden to establish the presumption in favor of detention.

As our sister circuits have found, section 3142(e)(3)'s presumption in favor of detention imposes only a "burden of production" on the defendant, and the government retains the "burden of persuasion." *See, e.g.*, *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001); *United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985).  A defendant satisfies his burden of production when he "com[es] forward with evidence

that he does not pose a danger to the community or a risk of flight." *Mercedes*, 254 F.3d at 436.  Although a defendant's burden of production "is not heavy," he must introduce at least some evidence.  *United States v. Stricklin*, 932 F.2d 1353, 1355 (10th Cir. 1991); *see also United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991) ("[A] defendant must introduce some evidence contrary to the presumed fact in order to rebut the presumption.").

Even when a defendant satisfies his burden of production, however, "the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." *Mercedes*, 254 F.3d at 436.  The presumption remains as a factor because it is not simply an evidentiary tool designed for the courts.  Instead, the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial.  *See United States v. Jessup*, 757 F.2d 378, 384 (1st Cir. 1985), abrogated on other grounds by *United States v. O'Brien*, 895 F.2d 810 (1st Cir. 1990), ("Congress intended magistrates and judges, who typically focus only upon the particular cases before them, to take account of the more general facts that Congress found"); *see also United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986) ("[T]he presumption of dangerousness . . . represents Congressional findings that certain offenders . . . are likely to continue to engage in criminal conduct undeterred either by the pendency of charges against them or by the imposition of monetary bond or other release conditions.").  To rebut the presumption, therefore, a defendant should "present all the special features of his case" that take it outside "the congressional paradigm[.]" *Jessup*, 757 F.2d at 387.

Regardless of whether the presumption applies, the government's ultimate burden is to prove that no conditions of release can assure that the defendant will appear and to assure the safety of the community.  In determining whether the government has met that burden of persuasion, the court must consider certain factors:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, . . . a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including—

> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. . . .

18 U.S.C. § 3142(g).  However, consideration of these factors shall not be construed to modify or limit the presumption of innocence.  18 U.S.C. § 3142(j).

In cases like this one, involving multiple defendants who are not necessarily similarly situated, the dangerousness inquiry must be an individualized one.  Just as at trial, in which courts and juries must resist the urge to find guilt or innocence by association, each defendant is entitled to an individualized determination of bail eligibility.

**A.     Government's Burden to Show Probable Cause**

All five defendants here are charged with very serious offenses, some of which trigger the presumption in favor of detention.[4]  Count two, attempt to use weapons of mass destruction, in violation of 18 U.S.C. § 2332a(a)(2), qualifies for the presumption under section 3142(e)(3)(C), and counts four and five, carrying, using, and possessing a firearm during and in relation to a crime of violence, in violation of

---

[4]Although the charges have changed slightly in the superseding indictment, all defendants remain subject to the presumption.

18 U.S.C.§ 924(c)(1), qualify under section 3142(e)(3)(B).[5] Thus, the indictment on counts two, four, and five satisfies the government's preliminary burden to show probable cause for all defendants and to establish the presumption of detention.

**B.    Defendants' Burden to Rebut the Presumption of Dangerousness**

Here, each defendant has satisfied his burden of producing some evidence tending to demonstrate that he is not dangerous.  The district court opinion discusses favorable information about each defendant's character and criminal history.  Additionally, each defendant also produced a third-party custodian or other character witness to testify on his behalf.  While defendants' evidence focuses mainly on their potential risk of flight rather than on the danger that they may pose to the community, their burden is relatively light.  Therefore, each defendant has put forward sufficient evidence to satisfy his burden of production.

**C.    The Government's Burden of Persuasion to Show Dangerousness**

**1.    The Nature and Circumstances of the Offenses Charged**

The charges here are undeniably serious.  The seditious-conspiracy and weapons of mass destruction charges arise from the defendants' plot to kill law-enforcement officers in a particularly heinous manner:  by first killing a single officer and then placing improvised-explosive devices (IEDs) along the path of his funeral procession.  The purpose of the planned attack was apparently to weaken the officers' morale and to spark a revolution against the government.  The firearm charges relate to various training sessions, during which defendants allegedly prepared for the upcoming revolution.  Thus, these charges, on their face, indicate a strong threat to society.[6] *Compare*

---

[5]All of the defendants are charged with count four and all of the defendants but Piatek are charged with count five.

[6]The appropriateness of detention here is underscored, moreover, by comparing these five defendants to other categories of cases where pre-trial detention is routinely ordered.  For example, drug dealers are also subject to the statutory presumption in favor of detention. *See* 18 U.S.C. § 3142(e)(3)(A). And our Court routinely affirms, on dangerousness grounds, the pre-trial detention of run-of-the-mill drug dealers, even without any indication that the defendant has engaged in violence. *See, e.g.*, *United States v. Hinton*, 113 F. App'x 76 (6th Cir. 2004) (unspecified drug trafficking charges); *United States v. Ortiz*, 71 F. App'x 542 (6th Cir. 2003) (conspiracy to distribute and possess over five kilograms of cocaine);

*Mercedes*, 254 F.3d at 437 (the crime of "conspiracy to commit armed robbery of a drug dealer . . . weighs heavily against release").

In terms of dangerousness, Congress also thought it was especially significant if the charges include "a crime of violence, . . . a Federal crime of terrorism, . . . or involve[] a . . . firearm, explosive, or destructive device." 18 U.S.C. § 3142(g)(1). The charges here possess those elements. The seditious-conspiracy and weapons of mass destruction charges are each crimes of violence; the weapons of mass destruction charge involves explosives; and the firearms charges, naturally, involve firearms. The weapons of mass destruction charge also likely qualifies as a Federal crime of terrorism. *See* 18 U.S.C. § 2332b(g)(5)(A) (defining that phrase as including a violation of the weapons of mass destruction statute, if the violation is "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct"). As the district court (under)stated, "this factor . . . weighs in favor of detention." (Dist. Ct. Op. at 12.)[7]

As discussed in some detail below, each defendant here has a demonstrated interest in committing actual, physical violence against law enforcement and several have shown a lack of concern about the likelihood of killing civilians, through the use

---

*United States v. Miller*, 39 F. App'x 278 (6th Cir. 2002) (conspiracy to possess with intent to distribute marijuana); *United States v. Lattner*, 23 F. App'x 363 (6th Cir. 2001) (unspecified "drug trafficking charges"); *United States v. Gray*, 20 F. App'x 473 (6th Cir. 2001) (conspiracy to possess with intent to distribute seven kilograms of cocaine, testimony from family members insufficient to overcome the presumption). To be sure, drug trafficking is a serious offense that, in itself, poses a danger to the community. *See United States v. Hare*, 873 F.2d 796, 798 (5th Cir. 1989) (stating that "[t]he risk of continued narcotics trafficking on bail constitutes a risk to the community," cited approvingly in many of the previously listed cases); *see also United States v. Leon*, 766 F.2d 77, 81 (2d Cir. 1985) ("[I]t is clear that the harm to society caused by narcotics trafficking is encompassed within Congress' definition of 'danger'"). But drug dealers do not necessarily pose the immediate risk of serious violence that the defendants here do, and therefore detention appears all the more warranted here.

[7]Our Court has also affirmed pre-trial detention in cases where the statutory presumption does not apply. In *United States v. Ramsey*, for instance, the defendant was charged with "conspiracy, possession of stolen mail, and making a false statement to a postal inspector." 110 F.3d 65 (table), 1997 WL 135443, at *1 (6th Cir. 1997). We upheld a finding of dangerousness based on factors including Ramsey's "access to firearms" and his commission of "criminal acts while on release from other charges." *Id.* Likewise, the defendant in *United States v. Abboud*, 42 F. App'x 784 (6th Cir. 2002), ran a check-kiting scheme and kept several guns at home. We affirmed his detention on both flight-risk grounds and "the danger of further illegal activity" if he was released. In neither case did the court address the defendant's propensity for violence.

of weapons of mass destruction, firearms, and other means. Thus, the nature and circumstances of the charges against all defendants weigh in favor of detention.

## 2.     The Weight of the Evidence Against Defendants

This factor goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt. *See Hazime*, 762 F.2d at 37 (noting that the weight of evidence against the person "deals with the factors to be considered in determining whether there are conditions which will assure the appearance of the accused and safety of the community"); *see also United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991) (Section 3142(g) "neither requires nor permits a pretrial determination of guilt"). At the bail hearings before the magistrate and before the district court, the government introduced evidence in the form of transcripts of conversations among defendants before the undercover FBI agent, lists of the items seized at defendants' homes (including weapons,[8] bomb-making implements, and military rations), and proffer of what the undercover FBI agent would testify to at trial. When the district court ordered that the government present a witness who could be cross-examined, the government brought forth an FBI agent with little or no firsthand knowledge of the events. However, conducting a bail hearing by proffer is acceptable under the law and at the discretion of the district court. *See United States v. Webb*, 238 F.3d 426 (table), 2000 WL 1721060, at \*2 (6th Cir. 2000) ("[T]the government may proceed in a detention hearing by proffer or hearsay."); *see also United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996) ("Every circuit to have considered the matter . . . [has] permitted the Government to proceed by way of proffer."). Thus, we will examine

---

[8] Based on the record before the district court, it appears that each of the hundred or so weapons recovered when defendants' homes were searched were legally purchased and registered. However, this is not dispositive to our consideration of dangerousness. It is also legal to purchase and own fertilizer and diesel fuel, but if a person who has made threats against the government purchases large quantities of both, it creates a different, more dangerous, implication. *Compare United States v. Hir*, 517 F.3d 1081, 1090 (9th Cir. 2008) (affirming pre-trial detention of terrorism-financing suspect based in part on "large cache of firearms and ammunition found in searches" of the defendant's home); *United States v. Portes*, 786 F.2d 758, 765 (7th Cir. 1985) (stating that the defendant was dangerous for reasons including that "agents found three dangerous weapons: a forty-five caliber handgun, a three-fifty-seven magnum, and a two-shot derringer" in his home).

the evidence before the district court to determine how convincing the government's evidence of dangerousness is.

### a.        David Stone, Sr.

When Stone's home was searched, the FBI found at least 37 firearms, ammunition for the seized weapons, and military gear and uniforms. The FBI also found components for IEDs, including threaded pipes, shrapnel, electronic matches, cannon fuse, and explosive powder. He led seventeen training sessions and events for the Hutaree, as its leader, between September 2008 and March 2010, including those at which explosive devices were demonstrated. When making plans for the "real op," David Stone stated that any member of the team who encountered a civilian while on the mission was to "handle it as a hostile situation. That means you put them on the ground. Either putting bullets in them, or if they just willingly get down on the ground, and let you leave the area peacefully, great." (R. 157.) He went on to note that "Putting bullets through bodies ain't an easy thing, but hey you do it a couple of times it don't bother ya." (*Id.*) He also instructed the Hutaree to wipe down all bullets and casings that they were bringing on the mission. This evidence weighs strongly in favor of dangerousness.

### b.        Joshua Stone

After Joshua Stone heard that his eight co-defendants had been arrested, he "sought weapons, sought cash, sought vehicles, [and] sought to arm himself and other Hutaree members who rallied around him[.]" (R. 85 at 67.) He then engaged in an armed stand-off with federal agents for two days. He ultimately surrendered without incident, but only after his wife and step-mother made a video asking him to come out peacefully. (*Id.* at 72.) Aside from surrender, his actions were consistent with the Hutaree's 10-step protocol for resisting the government; Joshua Stone simply failed to execute the last step, known as "Point of No Return." (R. 157 at 23.)

Joshua Stone also demonstrated his dangerousness through his role as second-in-command of the Hutaree. In planning the "real op", Joshua Stone told his patrol squad, "don't be afraid to pull the trigger on anybody, if we have to," and "welcome

to . . . being in the business of shooting people." (Gov't App'x at 57.) This evidence weighs strongly in favor of dangerousness.

### c.     Michael Meeks

When Meeks' home was searched, the FBI found 16 long guns and thousands of rounds of ammunition, in addition to substantial food stockpiles and gas masks. He had been tasked to get component materials for IEDs, though no explosive devices were found in his home. He has spoken frequently about different ways to kill police officers, owns five semi-automatic weapons and has stated that he has a thousand tracer rounds for his AR-15 that he would be "doling [] out" to the Hutaree. He voiced plans to die by "copicide," which he has explained means killing a law enforcement officer while dying at the hands of another officer. On a single day in June 2009, Meeks suggested blowing up a local bridge "when the enemy came"; he "discussed capping a member of law enforcement and seizing that person's weapons"; and he stated that members of Congress "think they're different" but "[w]ait until they found out that they bleed exactly the same." (R. 87 at 8.) Meeks also declared: "We got to start over man. We got to get rid of the judicial system, everybody. They need to die." (*Id*.) In February 2010, another Hutaree member suggested killing a judge, and Meeks chimed in: "I'm lookin' at enough people right here to take out virtually anybody. And I mean virtually anybody. You just got to be motivated enough to go do it." (Gov't App'x at 52.) This evidence weighs strongly in favor of dangerousness.

### d.     Thomas Piatek

When Piatek's home was searched, the government seized, among other things, 46 firearms, 13,000 rounds of ammunition, smoke grenades, a ballistic vest and helmet, a cross-bow, and a CD regarding explosives. (R. 91 at 29-35.) During a trip with several Hutaree members to a Kentucky militia conference, after David Stone "guaranteed" that he would "pop" a police officer, Piatek then "expressed his own hatred for law enforcement." (*Id*. at 25); *see United States v. Gomez-Fernandez*, 198 F.3d 259 (table), 1999 WL 992985, at *2 (10th Cir. 1999) (a single threat to a police officer is

sufficient to show a danger to the community).  This evidence weighs strongly in favor of dangerousness.

### e.     Joshua Clough

The government has proffered that Clough knows how to construct trip-wire detection systems, and he was likely responsible for one used during the Hutaree's training.  (R. 157 at 10-11, R. 85 at 80.)  Moreover, Clough's own statements reflect a desire to kill federal officials.  Upon seeing a list of "federal judges, elected officials, business leaders and educational leaders," Clough remarked that "it looked like a ready-made hit list for the Hutaree."  (R. 85 at 27-28.)  Clough also posted, on a militia website, a message promoting violence against ATF agents:  "ATF Agents were at our local [firearms dealer] today looking for all paperwork specifically relating to our commander. . . . We have and will return fire.  The question is, will you?  Hutaree.com."  (*Id.* at 13.)  This evidence weighs strongly in favor of dangerousness.

### 3.     The History and Characteristics of the Defendants

While the district court did not make findings as to the dangerousness of the defendants, the court did make findings as to defendants' individual histories and characteristics.  While only Piatek and Meeks have prior criminal histories, courts have never required a prior criminal record before ordering detention.  *See Rodriguez*, 950 F.2d at 89 ("Although a prior record of violence eases the government's burden of showing dangerousness, it is not essential.").

### a.     David Stone, Sr.

The district court made the following factual findings about this defendant:

> David Stone is 45-years-old, and is married to co-Defendant Tina Stone.  He is the father of four adult children.
> David Stone worked at Performance Engineering in Adrian, Michigan from July 2007 until July 2008.  In 2008, he worked for a few months at Iott Farms in Petersburg, Michigan.  He currently works as a Forklift Driver for Demlow Products in Clayton, Michigan.

He does not have any physical or mental health problems. He does not drink alcohol or use illegal drugs.  The results of his drug test were negative.

David Stone has no criminal history.

(Dist. Ct. Op. at 25).

Thus, this factor weighs slightly against dangerousness.

### b.       Joshua Stone

The district court made the following factual findings about this defendant:

Joshua Stone is 21-years-old, and is married to Shannon Stone (Shannon had some involvement in the Hutaree).  Shannon indicated that Joshua Stone helped her graduate from high school, and she wants to help Joshua Stone get his GED.  Shannon also wants to help Joshua Stone get out of the "militia mess."

Joshua Stone has seasonal employment.

Joshua Stone does not have any physical or mental heath problems.  He does not drink alcohol or use illegal drugs.

He has no criminal history.

(Dist. Ct. Op. at 26).

Thus, this factor weighs slightly against dangerousness.

### c.       Michael Meeks

The district court made the following factual findings about this defendant:

Meeks is a 40-year-old single man. He does not have children.

Meeks attended Washtenaw Community College, earning a paramedic certification.

Meeks was in the United States Marines from 1988-1992, including combat service in Desert Storm.  Before he was discharged from active duty, he earned a Rifle Expert Badge, a Certificate of Appreciation, a Sea Service Deployment Ribbon with one star, a National Defense Service Medal, a Combat Action Ribbon, a Southwest Asia Service Medal, a Good Conduct Medal, a Meritorious Mast, and a Kuwait Liberation Medal.

Meeks works as a truck driver for Interactive Metals in Adrian, Michigan (his driving is confined to a two-hour radius around the City of Adrian).  Meeks' employer, Matthew Anderson, describes Meeks as "a valuable part of our business team," and "dedicated, hard-working and very loyal as an employee."  According to Mr. Anderson, "It would be a great disappointment for us to lose [Meeks]."

At the bond review hearing, the Government stated that David Stone allegedly asked Meeks to obtain metal pieces for IEDs. However, no evidence was presented that Meeks actually obtained metal from his employer.

Meeks' mother, Sylvia Meeks, testified at the bond review hearing and indicated that Meeks uses her address for mail, instead of listing his address with the United States Postal Service, because it is more convenient for Meeks to get his mail when he visits his parents.

Although Meeks has not lived at the address listed on his driver's license for over five years, Meeks says he provided the agents his current address when he was arrested on these charges.

Meeks proffered a newspaper article that says he helped search for two missing citizens with the Bridgewater Township Officers.

Meeks does not have any physical or mental problems. He does not use drugs, but his mother believes he drinks alcohol to excess.

Meeks has a misdemeanor conviction from 1997 for drunk driving.

(Dist. Ct. Op. at 27-28).

Thus, this factor weighs slightly against dangerousness.

### d.        Thomas Piatek

The district court made the following factual findings about this defendant:

Piatek is a 47-year-old single man. He has a 25-year-old daughter and two grand daughters, whom he helps support.

Piatek has worked as a truck driver for Meyer Industrial Container in Chicago, Illinois for 17 years.

Piatek is the primary caregiver for his special needs brother, participates in the Fourth of July parade, and is an associate member of the Fraternal Order of Police.

People describe Piatek as "a down-to-earth person," someone who would "help anybody," someone who does not engage in "aggressive" behavior or "any kind of violence," someone who "goes to work every day," and someone who would "probably be the first one to render aid [if there was somebody hurt]."

Piatek does not have any physical or mental health problems. He does not use drugs or drink alcohol. His urinalysis results were negative.

In 1990, Piatek was charged with Aggravated Assault and Driving on a Median. Piatek successfully completed one year of supervision, and the case was dismissed.

(Dist. Ct. Op. at 28-29).

Also before the court, but not mentioned in its opinion, is the government's evidence that Piatek's former girl-friend made a police report on February 26, 2010, indicating that she was afraid of him because he had recently taken a gun from behind the driver's seat of his vehicle and said, while in the process of loading the weapon,"If you ever break up with me . . . I'll pop you." Additionally, "in early March, upon learning that she was pregnant with his child, Piatek said that she would never see her 20-year-old son get married if she went through with the pregnancy." (Gov't Letter Br. at 8-9.)

Thus, this factor weighs in favor of dangerousness.

### e.    Joshua Clough

The district court made the following factual findings about this defendant:

> Clough is a 28-year-old single man who lives with his parents.
> Clough was a self-employed videographer for nine years before he became a security guard at a shopping mall in Adrian, Michigan (he may no longer have this job due to his arrest on these charges).
> Clough does not have any physical or mental health problems. He does not drink alcohol or use illegal drugs.
> Clough has no criminal history.

(Dist. Ct. Op. at 27).

Thus, this factor weighs slightly against dangerousness.

4.      **The Nature and Seriousness of the Danger to Any Person or the Community**

a.      **David Stone, Sr.**[9]

The evidence proffered at the detention hearing tended to show that David Stone conducted a number of trainings that involved explosives and trip-wire devices. He knows how to construct them and was at least interested in learning about their construction and use before the federal agent intervened. He had a hit list of government employees, an extensive arsenal of weapons in his home, and a number of items used in the construction of explosive devices were found in his home. He made repeated threats against federal and judicial employees and was involved in planning a "real op" in which he planned to kill law enforcement officers and civilians. Thus, this factor weighs in favor of finding that David Stone would pose a serious danger to the community if released.

Viewing all of the factors together, we conclude that, as to David Stone, Sr., no conditions of release will reasonably assure the safety of the community.

b.      **Joshua Stone**

Joshua Stone already demonstrated his willingness to evade the police; after hearing about the arrests of other Hutaree members, he engaged in a two-day armed standoff with police before surrendering peacefully. He attempted to obtain weapons and cash from other members of the Hutaree and militia members. As second-in-command of the Hutaree, he planned the "real op", made threatening statements regarding law enforcement officers, and made statements planning the death of civilians that got in the way. Thus, this factor weighs in favor of finding that Joshua Stone would pose a serious danger to the community if released.

---

[9]It has been argued that, because their weapons were seized, defendants' possession of legal weapons should not be held against them. However, as the government proffered, there are approximately 25 Hutaree members at large who still have access to weapons. (R. 157 at 22); *cf. United States v. Trosper*, 809 F.2d 1107, 1111 (5th Cir. 1987) ("[W]e find it reasonable to conclude from the significant amount of false identification material . . . that other such documents exist and are available to [the defendant]"). Thus, it seems likely that defendants would be able to obtain weapons should they desire to do so.

Viewing all of the factors together, we conclude that, as to Joshua Stone, no conditions of release will reasonably assure the safety of the community.

### c.    Michael Meeks

Meeks made a number of statements evincing an interest in killing judges and law enforcement officers, in addition to civilians. Furthermore, authorities found a substantial arsenal of weapons, including 1000 tracer rounds, at his home. That type of weapons cache, combined with repeated statements about killing judges and law-enforcement officers, supports a finding of dangerousness. Moreover, his stated desire to die by "copicide" demonstrates an unacceptable risk that, if Meeks knows when the police are coming to bring him in, he might take some action. Thus, this factor weighs in favor of dangerousness.

Viewing all of the factors together, we conclude that, as to Michael Meeks, no conditions of release will reasonably assure the safety of the community.

### d.    Thomas Piatek

Piatek was heavily involved with the Hutaree, made a statement in favor of killing agents/civilians, and possessed a substantial arsenal of weapons. Moreover, he has made statements indicating a violent intent toward his girlfriend, which we may consider as evidence of dangerousness although it does not relate to the offenses charged. *See United States v. Quartermaine*, 913 F.2d 910, 917 (11th Cir. 1990) ("[W]e reject Quartermaine's suggestion that his acts of 'domestic' violence do not support a finding of dangerousness to the community. A willingness to strike loved ones offers probative evidence of a tendency to violence and dangerousness toward others"). Thus, this factor weighs in favor of dangerousness.

Viewing all of the factors together, we conclude that, as to Thomas Piatek, no conditions of release will reasonably assure the safety of the community.

### e.     Joshua Clough

Clough knows how to construct trip-wire detection systems, and he was likely responsible for one used during the Hutaree's training. This knowledge, coupled with his stated interest in killing federal agents and his posting on the Hutaree website that he "will return fire", demonstrates that Clough is a danger to society. Thus, this factor weighs in favor of dangerousness.

Viewing all of the factors together, we conclude that, as to Joshua Clough, no conditions of release will reasonably assure the safety of the community.

## IV.

Thus, we find that each defendant poses a danger to the community and that no conditions of release will reasonably assure the safety of the community. We therefore **REVERSE** the order of the district court and **REMAND** for further proceedings consistent with this opinion.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

HELENE N. WHITE, Circuit Judge, concurring in part and dissenting in part. I concur as to David Stone, Sr., Joshua Stone, and Michael Meeks, and dissent as to Thomas Piatek and Joshua Clough. I also write separately to observe that I find this to be a far closer call than the majority opinion would indicate.

The district court took seriously the government's burden to establish by clear and convincing evidence, as to each defendant, that no combination of conditions will reasonably assure the safety of the community. The government chose to proceed by proffer, consisting of both assertions of fact and broad conclusions, with sometimes vague references to the sources of the proffered information. The government witness presented for cross-examination was unable to provide meaningful answers to the questions posed by defendants' attorneys and the court.

The majority's account is not inaccurate, but it gives little attention to the concerns underlying the district court's decision. The FBI was following the activities of the Hutaree for approximately two years, during which time the group maintained a website, conducted field training activities, possessed vast quantities of ammunition and firearms (which, with the exception of three to four firearms, were not shown to the court to be illegal,[1] and which in one defendant's case were collected over twenty years), talked of the members' dislike of the United Nations, the government and government officials, especially law enforcement officers, and discussed various scenarios for killing law enforcement officers. However, the group and its members had never taken any action except for field training, and some of the taped conversations appeared to be in jest.

---

[1] The district court acknowledged that the government proffered that David Stone, Sr., possessed three to four firearms that appeared not to be of the legal length.

The tapes did not reveal a specific plan or plot to commit any of the charged offenses, but rather indicated an interest in doing so; the same interest that had been present for some time, and upon which none of the defendants had acted. It was against this backdrop that the district court determined that the conditions imposed would reasonably assure the safety of others and the community.

Notwithstanding the foregoing observations, I agree with the majority that taking into consideration the Congressional presumption of dangerousness that attaches to certain of the charged offenses, which presumption does not disappear in the face of contrary evidence, but must be considered in the calculus of dangerousness, no conditions of release will reasonably assure that defendants Stone, Sr., Stone, and Meeks will not present a danger to the community.

As to Piatek, the evidence showed that he has worked for the same company as a truck driver for seventeen years and is a valued employee, that he participates in community organizations, that he supports his family, and that the weapons found at his home were registered and were collected over the course of twenty years. Were it not for the government's proffer of his girlfriend's complaint to law enforcement authorities that he threatened her, I would affirm the district court's decision. Piatek's counsel responded to the government's allegations by asserting that Piatek was never arrested or charged, that he is still dating the complainant, and that she had planned a joint birthday party for Piatek and her brother to be held the weekend after Piatek's arrest. The district court did not address the girlfriend's complaint in assessing Piatek's dangerousness. I agree with the majority that unrelated conduct evincing dangerousness can be considered in assessing whether a defendant can safely be released pending trial. However, given the conflicting contentions, and the importance of the girlfriend's complaint to the evaluation of Piatek's dangerousness, I would not reverse the district court's determination, but rather, would vacate and remand for reconsideration, taking into account the allegations and Piatek's response, together with any further information.

As to Clough, I would affirm the district court. The trip-wire detection system is designed to detect intruders. Although the government argues that the same

technology can be used to set off devices, there is no indication that Clough used or intended to use it in that manner. The posting on the website was the general posting at the bottom of the group's website, and should be viewed in that context, not as a statement of Clough's intent. Further, the reference to returning fire assumes that the group is being fired upon, and does not suggest an offensive attack. The other statements attributed to Clough are more in the nature of observations than threats — the list of elected officials looked like a "hit list" for the Hutaree; observing during a conversation regarding killing police officers that "it would not be a pretty day for any officers coming down here." The government has not met its burden of persuasion that no conditions of Clough's release can reasonably assure the safety of others and the community.