UNITED STATES of America

v.

**Raul Ochoa PEREZ.**

**Magistrate Judge Action No. 5:14–MJ–75.**

United States District Court, S.D. Texas, Laredo Division.

Signed April 29, 2014.

James Bruce Hepburn, U.S. Attorney's Office, Laredo, TX, for United States of America.

Marcel C. Notzon, III, The Notzon Law Firm, Laredo, TX, for Raul Ochoa Perez.

### *MEMORANDUM & ORDER*

J. SCOTT HACKER, United States Magistrate Judge.

Defendant is currently being held in federal custody on a criminal complaint charging him with a violation of 18 U.S.C. § 1201, the federal kidnapping statute. (Dkt. No. 1). More specifically, it is alleged through the complaint that Defendant kidnapped a Heriberto Benavides, Jr.

at gunpoint, drove him across the international border to Nuevo Laredo, Tamaulipas, Mexico, and held Benavides ransom for several hours until Benavides was able to manage an escape. In terms of a motive for the kidnapping, Defendant supposedly accused Benavides of stealing his "merchandise," a shipment of illegal narcotics. On April 22, 2014, a preliminary hearing was held in accordance with Rule 5.1 of the Federal Rules of Criminal Procedure to determine whether there is probable cause to believe Defendant has committed an offense.

At the hearing, the Government presented the testimony of a special agent with the Federal Bureau of Investigation, Jorge Hernandez. Agent Hernandez investigated this case with a Special Agent Robert D. Bailey, who swore an affidavit in support of the complaint. In attempting to discredit Bevavides and also to establish what essentially amounts to an alibi defense, Defendant presented several exhibits as well as the testimony of several witnesses, including the testimony of Benavides himself. According to the defense's version of events, Benavides asked Defendant for a ride to Nuevo Laredo. Defendant obliged, dropped off Benavides at his requested location, and then drove to an auto yard at the city's outskirts to purchase a car part for his car repair business.

Also pending is an "Emergency Motion for Court to Hear Exculpatory Testimony" (Dkt. No. 27)[1] filed by Defendant on April 25th. Through this motion, Defendant seeks to admit a sworn declaration by a witness who provides hearsay evidence to discount the claim that Benavides tried to hide from his kidnappers at a Nuevo Laredo pharmacy.[2] On April 28th, the defense filed an advisory associated with the motion (Dkt. No. 28), offering a copy of the receipt for the car part supposedly purchased by Defendant. The separately-filed declaration and the receipt will be entered into the record for consideration.

Nonetheless, having heard the parties, and based on a review of the evidence, the undersigned finds that the probable cause standard has been satisfied, and thus that Defendant will be required to appear for further proceedings.

### The Evidence

The evidence presented by each side will be discussed in turn.

### A. The Government's evidence

The evidence presented by the Government consisted solely of the testimony of Agent Perez, who relayed the allegations made by Benavides. According to Agent Perez, the kidnapping occurred on January 13, 2014. That morning, the victim paid a visit to Defendant's shop located on Arkansas Street, Speed & Sport Auto Repair, in order to discuss a business matter. Although the exact business matter was left unspecified, Agent Hernandez did indicate that Benavides formerly worked as one of Defendant's drug mules. Nonetheless, at some point, Defendant and Benavides decided to continue their discussion over breakfast and thus departed from the shop

---

1. Two versions of this motion were filed, one at Docket Number 26, the other at Docket Number 27. The caption for the motion at Docket Number 26 names the incorrect defendant.

2. Defendant submitted his motion under seal "so as not to jeopardize the safety of [the] affiant." (Dkt. No. 27 at 2). Of note, the defense identified the declarant solely by the first initial of their given name and their full surname. Furthermore, the exact relationship between the declarant and Defendant or defense counsel's law firm was left unclear. Nonetheless, out of an abundance of caution, the declarant will not be referred to by name.

in Defendant's truck. Defendant operated the truck, and Benavides rode passenger. Benavides was apparently under the impression that they were headed to a Taco Palenque.

When they neared the Lincoln Juarez International Bridge (Bridge 2), Benavides asked Defendant where they were going and told Defendant that he did not want to go to Mexico. Defendant drew a handgun and pointed it at Benavides' left side. Defendant instructed Benavides not to move and threatened to kill him even if it were to lead to his own death at the hands of the federal agents posted at the bridge.

Between 9:00 and 10:00 a.m., they crossed via the bridge into Nuevo Laredo. Defendant then picked up a subject identified as "Plato," and they all drove to a gated residential building in town. A second, unidentified subject opened the gates to the property and locked the gates behind Defendant's truck. Once inside the building, Defendant and Plato began accusing Benavides of stealing Defendant's merchandise and demanded its return. Benavides' hands were tied behind his back with what he referred to as "piñata string." A box-cutter was put to Benavides' throat and a gun in his mouth. Plato and the second subject delivered a beating on Benavides that lasted for what he estimated to be a two hour period.

Meanwhile, Benavides overheard Defendant talking on the phone to his presumed boss, saying that they would kill Benavides even if they were to recover the drugs. According to Agent Hernandez, Benavides' common law wife also received several calls from Defendant, who demanded upwards of $55,000 or the return of the merchandise. When the beating ended, Benavides was left in a bathroom.

Although Agent Hernandez did not testify as to what happened next, it is uncontested that Benavides was able to free himself from his restraints, get past his kidnappers, and jump the gate of the property. After eluding the kidnappers in the surrounding neighborhoods, Benavides was able to make his way back to the international bridge by some time that afternoon. He reported the kidnapping to federal agents and was later interviewed by Agent Bailey.

On cross-examination, Agent Hernandez made several concessions. Agent Hernandez did not personally interview Benavides. Federal agents never corroborated that Benavides did indeed work for Defendant as a drug smuggler. Pictures taken of Defendant's truck as it crossed the international bridge to Mexico do not show Defendant holding a gun. Furthermore, defense counsel questioned Agent Hernandez as to whether Benavides had ever made inconsistent statements to investigators. Agent Hernandez testified that Benavides at one point claimed that he had been picked up at his apartment by Defendant. Defense counsel also made it a point to ask Agent Hernandez whether it was ever verified that Defendant and Benavides ate at Taco Palenque. However, Agent Hernandez clarified that Benavides was only told they were going to Taco Palenque, not that he and Defendant had actually eaten there.

## B. The defense's evidence

In support of its case, the defense presented testimony by the victim, Defendant's wife, and Defendant's sister. Defendant also offered several exhibits at the hearing. Furthermore, in response to a defense subpoena, and upon the Court's order (Dkt. No. 24), the Government has submitted documents reflecting the contents of Defendant's truck (Dkt. No. 25). Finally, through post-hearing filings, Defendant has offered a witness declaration

(Dkt. No. 27), as well as additional documentary evidence (Dkt. No. 28).

### 1. Benavides

As its first and primary witness, the defense called Benavides. Defense counsel asked Benavides about the inconsistency surrounding where Defendant and Benavides met on the morning in question. Benavides stated that a "Canelo," who works for Defendant, showed up at Benavides' apartment, and they left together in Canelo's truck to Defendant's shop. Benavides did not specify why Canelo went to his apartment, other than to say that Canelo had been assaulted. As to what time they arrived at the repair shop, Benavides was unable to remember. Defense counsel also examined Benavides as to whether he asked Defendant for a ride to Nuevo Laredo or whether he was forced into the truck. Benavides denied having any particular reason to go to Nuevo Laredo. He also denied being forced into the truck. According to Benavides, Defendant simply stated that they were going to eat breakfast.

It seems from Benavides' testimony that Defendant made his way onto Guadalupe Street, at which point Benavides asked where they were headed. Defendant supposedly stated they were going to Mexico and threatened to kill Benavides were he to refuse to go along. Defendant then made calls to his presumed boss in Mexico and to Canelo, asking him to make his way to Nuevo Laredo. Benavides claims that about half a block from the international bridge, Defendant pulled a black handgun. He supposedly held it in his right hand, flat against the bottom of the seat, pointed towards Benavides' body.

Benavides asserted that he did not remember the exact time they crossed into Nuevo Laredo. Upon arriving, Defendant pickup up someone whom Benavides re-called was referred to as "Plato" or "Plata." They then went to a residence located in the *Colonia Morelos* neighborhood. Benavides was unable to remember the exact corner on which the residence was located. According to Benavides, once at the residence, he was physically assaulted upon Defendant's orders by Plato and an unidentified subject. He also claimed that death threats were made against him.

Eventually, Benavides escaped. He stated that Defendant took two cell phones from him, so he was unable to determine the exact time. However, Benavides estimated that he was held at the residence for approximately two hours. Upon his escape, Benavides tried to hide from the kidnappers at a local pharmacy, *Farmacia Guadalajara*, which he recalled as being located on a street named either *Guerrero* or *Obregon*.

### 2. Defendant's wife

Next, the defense called Laura Villarreal, Defendant's wife. At the time of the kidnapping, Defendant and his wife had been married for approximately two months and were living at her parents' home in Laredo. Ms. Villarreal testified that Defendant usually wakes up for work at around 8:30 or 9:00 a.m. According to Ms. Villarreal, Defendant did not have a weapon with him when he left for work on the day in question. She also claimed that her husband is not "involved in drugs" and that she has never seen him use drugs. Ms. Villarreal testified that Defendant is left-handed.

### 3. Defendant's sister

The defense also called Defendant's sister, Liliana Perez. Ms. Perez claims that on the day of the kidnapping she called her brother several times but received no response. She then asked her mother about Defendant's whereabouts. Ms. Perez'

mother supposedly stated that Defendant had gone to his shop and then to Nuevo Laredo to buy some car parts. From her testimony, it seems that Ms. Perez talked to Defendant later that day about his purchase. Like Ms. Villarreal, Ms. Perez testified that Defendant is left-handed.

## 4. Documents

The following are summary descriptions of the exhibits and the separate declaration submitted by the defense and the records subpoenaed from the FBI.

*Invoices.* Exhibits Numbers 1 through 3 are invoices indicating that Defendant's business has performed auto repair work for the Drug Enforcement Administration and Customs and Border Protection.

*Polygraph results.* Exhibit Number 4 is a letter from Ronaldo Munoz. Mr. Munoz is a retired Texas state trooper and now a professional polygraph examiner. The letter addresses the results of a polygraph exam Mr. Munoz conducted on Defendant. As part of the exam, Defendant was asked whether he took Benavides against his will into Mexico, kidnapped Benavides at gunpoint from his place of business, forced Benavides across the border at gunpoint, and did harm to Benavides in any way in the United States or Mexico. Defendant answered "no" to these particular questions. In Mr. Munoz's opinion, the polygraph charts indicated "no deception" in Defendant's responses.

*Defendant's criminal records.* Exhibit Number 5 is a Webb County Sheriff's Office Record & Identification Bureau printout indicating that Defendant's criminal history consists of only two traffic violations and an arrest related to the instant kidnapping allegations. Exhibit Number 8

consists of copies of the arrest warrant issued in this case and the underlying criminal complaint and supporting affidavit.

*The victim's criminal records.* Exhibit Number 12 is another Record & Identification Bureau printout indicating that the victim's criminal history consists of eight arrests between 2007 and 2013 for charges related to reckless driving, discharging firearms, and aggravated assault. No dispositions for these arrests are indicated. Also listed is an arrest for a federal charge. Exhibits Numbers 6 and 7 reflect that this charge involved the intimidation of a trial witness. Exhibit Number 6 is a copy of the related 2010 complaint sworn before the undersigned. Exhibit Number 7 is a copy of the docket sheet in that case. The docket sheet reflects that the case was dismissed upon a motion by the assistant United States attorney.

*Google map.* Exhibit Number 9 is a Google map of an unidentified section of Nuevo Laredo. Defense counsel heard Benavides to testify that *Farmacia Guadalajara* is located at the intersection of the streets *Guerrero* and *Obregon.* From the map, defense counsel pointed out that these streets run parallel to each other.

*Repair shop employee declarations.* Exhibits Numbers 10 and 11 are sworn declarations by Carlos Camacho and Mario Valdez Orozco, both of whom formerly worked at Defendant's auto repair shop. According to the declarations, on "Monday, January 14, 2014,"[3] at approximately 9:30 a.m., they each witnessed a young man wearing a cap walk into the shop and ask Defendant for a ride. Defendant supposedly agreed, and he and the young man left the shop in Defendant's truck. Mr. Valdez identifies Benavides from a mug

---

**3.** Of note, the alleged kidnapping is said to have occurred on Monday, January 13, 2014.

The date referred to above, the 14th of January, fell on a Tuesday.

shot attached to the declaration as the young man in question. Mr. Camacho and Mr. Valdez also declare that they were questioned by federal agents on January 15th about the alleged kidnapping. Mr. Camacho has since been deported to Mexico.[4] Mr. Valdez appears to have been detained by immigration. He is currently being held at a detention center in Raymondville, Texas.

**The Farmacia declaration.** Through a post-hearing declaration, a witness swears to have spoken to the staff at two separate pharmacies named *Farmacia Guadalajara* in Nuevo Laredo. The first pharmacy is located at the intersection of *Calle Campeche* and *Aquiles Serdan.* On April 24, 2014, the declarant drove from Laredo to the pharmacy and had a discussion with the manager regarding Benavides' claim that he sought help at a *Farmacia Guadalajara* after the beating. The manager denied that anyone had shown up asking for help on the date of the kidnapping. The declarant also presented the manager with Benavides' mug shot, but the manager denied ever having seen him. The manager kept a copy of the photograph to show to the employees who were at the pharmacy on the day in question. Several hours after their discussion, the manager called the declarant and said that none of the employees were able to recall anything out of the ordinary. Nor were they able to recognize the person in the mug shot.

On April 25, 2014, the declarant called the same pharmacy and spoke to an employee, who said that she did not remember any unusual event occurring at the pharmacy on the relevant date. The declarant asked this employee if there was any way that a person would have been able to hide in or behind a walk-in refrig-

erator, as was sworn to by Agent Bailey in the complaint. The employee supposedly stated "that there is no access to the area where a person would hide in or behind the refrigerated, [sic] because the refrigerated area is ins[i]de the store, and due [to] the doors being locked." (Dkt. No. 27, Attach. 1 at 1).

The declarant also swears to calling a second *Farmacia Guadalajara* located on the intersection of *Obregon* and *Venezuela.* The declarant spoke to the manager, who did not want to provide her name for fear of retaliation. The manager claimed not to recall anyone seeking help at the pharmacy on the day of the kidnapping. The declarant asked the manager to fax a written statement to defense counsel's law firm, but the manager refused to do so.

**Subpoenaed evidence.** As discussed in a prior order, the defense subpoenaed several items supposedly seized by the FBI from Defendant's truck, including a receipt reflecting a purchase on the day of the alleged kidnapping for a car part from an auto shop on the outskirts of Nuevo Laredo, and two receipts issued on the same day from international toll bridges indicating the times Defendant crossed from Laredo to Nuevo Laredo and back. (*See* Dkt. No. 24). The Government has submitted three items in response. The first is a receipt from City of Laredo Bridge 2 with a date stamp of "01/13/14" and a time stamp of "09:50." (Dkt. No. 25, Attach. 1). The second receipt reflects a deposit to a checking account at Commerce Bank Saunders Branch with a date stamp of "01/13/2014" and a time stamp of "05:02:38 PM." (*Id.,* Attach. 2). The Government represents that these were the only receipts from the relevant time period found in Defendant's truck. The Government

---

**4.** Through his April 28th advisory, the defense represents that Mr. Camacho is presently in Nuevo Laredo and that he is available to testify. (Dkt. No. 28). However, because the undersigned will consider Mr. Camacho's declaration, his live testimony is unnecessary.

has also submitted a photo of the open truck bed, showing what looks to be a loose car part inside.

*Car part receipt.* Through a post-hearing advisory, the defense has submitted a receipt for the car part originally subpoenaed from the FBI. (Dkt. No. 28, Attach. 1). No explanation has been offered as to where this receipt was found. Nonetheless, the receipt appears to have been issued by *Yonke*[5] *Los Caballos 2* and lists an address in Nuevo Laredo. The receipt is dated *"13/Enero/14,"* or January 13, 2014, and indicates that a *"Bisel Izq. Trsero"* was purchased for 500 pesos, or around $40 in U.S. currency. The defense represents that the part purchased, and the one depicted in the photo of the truck bed, is the rear left bezel to a 1969 Roadrunner. (Dkt. No. 28. at 1–2).

### Discussion

#### A. Legal Standard

The preliminary hearing is governed by Rule 5.1 of the Federal Rules of Criminal Procedure. Under Rule 5.1(e), "[i]f the magistrate judge finds probable cause to believe an offense has been committed and the defendant committed it, the magistrate judge must promptly require the defendant to appear for further proceedings." Fed.R.Crim.P. 5.1(e). On the other hand, subsection (f) provides that "[i]f the magistrate judge finds no probable to believe an offense has been committed or the defendant committed it, the magistrate judge must dismiss the complaint and discharge the defendant." Fed.R.Crim.P. 5.1(f). Put simply, the purpose of a preliminary hearing is to determine whether there is probable cause to hold a defendant until grand jury proceedings. *United States v. Roach,* 590 F.2d 181, 184 n. 4 (5th Cir. 1979) (citing *United States v. Coley,* 441 F.2d 1299 (5th Cir.), *cert. denied,* 404 U.S. 867, 92 S.Ct. 85, 30 L.Ed.2d 111 (1971)).

Neither the criminal procedural rules nor criminal code define "probable cause." *United States v. Infante,* 782 F.Supp.2d 815, 817 (D.Ariz.2010). Indeed, "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Nonetheless, probable cause may be based on a fair probability that the defendant committed the alleged offense. *See id.* at 238, 103 S.Ct. 2317.

For purposes of Rule 5.1, the probable cause determination is made *de novo* relative to the arrest, based on the facts and circumstances as they exist at the time of the preliminary hearing.[6] *United States v. Rodriguez,* 460 F.Supp.2d 902, 907 (S.D.Ind.2006); *see also* 24 J. Moore, *Moore's Federal Practice—Criminal Procedure* § 605.1.03 (2014) ("The inquiry is not a retrospective one as to whether there was probable cause at the time of arrest. Rather, it is an assessment of whether there is probable cause at the time of the hearing, and thus it may include an evaluation of evidence gathered subsequent to the formal arrest."). It is the government's burden to submit suffi-

---

**5.** The undersigned understands "yonke" to be a slang term associated with junk yards.

**6.** "[T]he preliminary hearing does not consider whether probable cause supported the issuance of an arrest warrant or whether officers had probable cause at the time of arrest, inquiries for which a less-stringent standard of probable cause accommodates the different contexts of facts, circumstances, and balancing of interests that occur at the time those decisions are made." *Rodriguez,* 460 F.Supp.2d at 907 (citing *Gerstein v. Pugh,* 420 U.S. 103, 112, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975)).

cient evidence of these facts and circumstances. 1 Charles Alan Wright, et al., *Federal Practice & Procedure* § 92 (4th ed. 2013). Furthermore, all reasonable inferences are to be drawn in favor of the government. *United States v. Spencer,* 2013 WL 2417976, at *1 (S.D.Ohio June 3, 2013) (citing *United States v. Fuentes,* 2012 WL 379589, at *2 (S.D.Tex. Jan. 19, 2012)); *United States v. Al–Ahmad,* 996 F.Supp. 1055, 1057 (D.Colo.1998); Wright, *supra,* at § 92 (citing *Fuentes,* 2012 WL 379589 at *2).

"The Rules of Evidence, other than with respect to privileges, do not apply at a preliminary hearing." Wright, *supra,* at § 92 (citing Fed.R.Evid. 1101(d)(3)). Thus a probable cause finding may be based in whole or in part on hearsay. Fed. R.Crim.P. 5.1(a). Indeed, as a matter of general practice, the government will attempt to meet its burden by summarizing the evidence against the accused, including the substance of any witness statements, through the testimony of a case agent or investigator. Nonetheless, a magistrate judge has the discretion to require that any evidence presented at a preliminary hearing exist in some admissible form for trial purposes. *See* Wright, *supra,* at § 92 (citing Advisory Committee Note of 1972 to Fed.R.Crim.P. 5.1). Any reference to evidence that exists in some form admissible at trial will likely carry greater weight at a preliminary examination than evidence that does not exist in admissible form.

■ The magistrate judge has broad discretion in supervising the questioning of witnesses, including the authority to terminate questioning once probable cause has been established. Wright, *supra,* at § 92. At the same time, the defendant has a well-recognized right to the assistance of counsel at a preliminary hearing. *See Coleman v. Alabama,* 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970). In order to effectuate this right, defense counsel must be afforded the opportunity to cross-examine the government's witnesses. *See Coleman v. Burnett,* 477 F.2d 1187, 1201, 1204–05 (D.C.Cir.1973). It is as much the arrestee's prerogative to endeavor to minimize the evidence in support of probable cause as it is the government's to undertake to maximize it. *Id.* at 1204. Cross-examination by the defense may thus be limited only where questioning attempts to address issues other than probable cause. *See* Wright, *supra,* at § 92. Although the line with permissible refutation of probable cause is often thin, the preliminary hearing is not a discovery device. *See id.* at 1201.

■ At the preliminary hearing, the defense may present its own evidence.[7] Fed. R.Crim.P. 5.1(e). The defense may also subpoena witnesses and evidence from the government. *See Coleman,* 477 F.2d at 1205. Again, however, any fishing expeditions are to be limited. *See id.* at 1201. Accordingly, a defense subpoena should be granted only where the request is material and could contribute to the accuracy of the probable cause determination. *See id.* at 1205.

■ Ultimately, the magistrate judge's role is simply to determine whether the government has presented sufficient evidence to hold the defendant for further proceedings, not to pass on the accused's guilt or innocence. *See United States v. Kin–Hong,* 110 F.3d 103, 120 (1st Cir.1997) (citing *Coleman,* 477 F.2d at 1201). Given this limitation, it is generally inappropriate for the magistrate judge to make credibility determinations, which fall within the

---

**7.** Typically the defense will prefer not to preview its case and will thus avoid offering affirmative evidence at a preliminary hearing unless there is a substantial chance of showing that probable cause does not exist. Wright, *supra,* at § 92.

province of the jury as the trier of fact.[8] Nonetheless, the magistrate judge may still make a finding of no probable cause by relying on clear-cut proof of limited scope that negates the government's evidence.[9] Indeed, such authority extends from the justification for the preliminary hearing's existence—to protect innocent accused's from languishing in jail on totally baseless accusations. *See Spinelli v. United States*, 382 F.2d 871, 887 (8th Cir.1967), *rev'd on other grounds*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). Evidence of an alibi has been held admissible where it would negate probable cause. *See In re Extradition of Gonzalez*, 52 F.Supp.2d 725, 739 (W.D.La.1999).

**8.** Federal courts have recognized as much in the context of extradition proceedings, *see, e.g., Doll v. Williams*, 2009 WL 3103832, at *2 (M.D.Pa. Sept. 24, 2009), which serve a similar purpose and are thus in the nature of the preliminary examination, *see Matter of Extradition of Contreras*, 800 F.Supp. 1462, 1464–65 (S.D.Tex.1992). This proposition is further supported by the law of those states whose preliminary examinations serve the same purpose as that of their federal counterpart. In some jurisdictions, such as California, the preliminary examination emphasizes the probability of an ultimate conviction based on admissible evidence, and thus the proceeding takes the form of a "mini-trial," where the magistrate judge, as a trier of fact, can permissibly weigh the credibility of witnesses. *See Hunter v. District Court In and For Twentieth Judicial Dist.*, 190 Colo. 48, 543 P.2d 1265, 1268 (1975). In jurisdictions like Colorado, however, just as in the federal system, the function of the magistrate judge is simply to determine the existence or absence of probable cause that the defendant committed the offense. *See id.* at 1267–68. Because the magistrate judge does not serve as a trier of fact in such jurisdictions, it is generally improper for the judge to consider the credibility of the witnesses presented. *See id.* at 1268.

**9.** Again, such is the applicable law in federal extradition proceedings. *See· In re Sindona*, 450 F.Supp. 672, 685 (S.D.N.Y.1978); *see*

## B. Analysis

### 1. Probable cause

■ Here, in attempting to support probable cause to show that Defendant committed the alleged kidnapping offense, the Government has presented the testimony of a case agent, Agent Hernandez, who has relayed the account of the alleged kidnapping victim, Benavides. This account represents second-hand hearsay, as Agent Hernandez presumably heard the account from Agent Bailey, the interviewing agent. To the extent investigators were able to corroborate any aspects of Benavides' story, the Government referred to little such evidence in its presentation.[10]

*also In re Extradition of Gonzalez*, 52 F.Supp.2d 725, 738–39 (W.D.La.1999). Applying a similar rule are those state jurisdictions whose preliminary examinations play the same function as the federal preliminary examination. For example, in Colorado, a magistrate judge may consider witness credibility "only when, as a matter of law, the testimony is implausible or incredible." *See Hunter*, 543 P.2d at 1268. Otherwise, "[w]hen there is a mere conflict in the testimony, a question of fact exists for the jury, and the judge must draw the inference favorable to the prosecution." *Id.* Wisconsin frames this as a matter of degree, allowing for determinations only as to the plausibility of a story, rather than a witness's general trustworthiness. *See Wilson v. State*, 59 Wis.2d 269, 208 N.W.2d 134, 148 (1973).

**10.** For instance, at a detention hearing held just before the preliminary examination, the Government proffered that investigators found in the ceiling of a property associated with Defendant approximately $180,000 cash wrapped in duct tape, which is certainly circumstantial evidence of drug activity. *See, e.g., United States v. $242,484.00*, 389 F.3d 1149, 1162 (11th Cir.2004) ("Wrapping cash in cellophane-type material is a technique known to be used by drug dealers to prevent discovery by drug-sniffing dogs."). The Government also proffered that investigators found a semiautomatic handgun consistent with the one alleged by Benavides. Indeed, it

Perhaps the only corroborating circumstance is the assertion by Agent Hernandez that Benavides' wife received phone calls from Defendant asking for ransom. That said, the Government made no attempt to explain how Benavides' wife was even able to identify Defendant as the caller.

Indeed, the case presented by the Government is decidedly barebones. Nonetheless, as discussed above, hearsay is readily admissible at a preliminary hearing, and there does not appear to be any specific rule requiring the corroboration of such testimony. Furthermore, it is apparent that both Benavides and his wife will be available themselves to testify as to what Defendant supposedly did and said. Unquestionably, any alleged threats made by Defendant would be admissible based on a number of theories under the evidentiary rules. As such, the undersigned concludes that the aforementioned evidence is sufficient to establish probable cause that Defendant committed the federal kidnapping offense alleged.[11]

## 2. The defense

The defense took a varied approach to minimize the probable cause evidence. First, the defense essentially tried to bolster Defendant's credibility while discrediting Benavides. Second, it tried to establish an alibi capable of negating probable cause. The first approach is mostly un-convincing, but ultimately misguided. The second also fails.

### a. Credibility

As to the first approach, the defense attempted to bolster Defendant's credibility in hopes of establishing his own version of the events. To this end, evidence was offered showing that Defendant regularly contracts with several federal investigative agencies to do their auto repair work, that Defendant has no meaningful criminal history, and that he passed a polygraph exam. At the same time, much effort was made to discredit Benavides. For example, the defense noted Benavides' extensive arrest record. The defense raised an asserted inconsistency in Benavides' stories regarding who picked up whom and where on the morning of the kidnapping. Submitted into evidence were declarations by two repair shop workers who claimed that Benavides was the one who showed up at the shop asking Defendant for a ride. It was highlighted that photographs taken at the toll bridge do not show Defendant holding a gun on Benavides. Defendant's wife and his sister testified that he is left-handed. Also offered was a Google map indicating the relative positions of two Nuevo Laredo streets mentioned by Benavides when he referenced the location of *Farmacia Guadalajara*. Furthermore, based on the defense's separately-filed declaration, no one at either of the two pharmacies named *Farmacia Guadalajara* seemed to recall anyone asking for help on

---

is generally accepted that the government may proceed by proffer at a detention hearing. *See United States v. Stone*, 608 F.3d 939, 948–49 (6th Cir.2010) (collecting cases). However, preliminary hearings are governed by a different evidentiary rule.

**11.** In addition, it is uncontested, based on the parties' respective proffers at the detention hearing, that Defendant fled to Nuevo Laredo upon learning that he was being investigated for the putative kidnapping. This circum-stance is documented in the record through the letter by Ronaldo Munoz explaining Defendant's polygraph results. The letter makes reference to the fact that the polygraph exam was conducted in Nuevo Laredo. After three months, *and only after receiving his polygraph exam results*, did Defendant return to the United States to face prosecution. Regardless, evidence of flight is generally held to evince a guilty conscience. *See United States v. Kalish*, 690 F.2d 1144, 1155–57 (5th Cir. 1982) (collecting cases).

January 13th, the day of the alleged kidnapping.

Notably, some of this evidence attacks peripheral details of Benavides' story, such as the evidence suggesting it was Benavides who asked Defendant for a ride. Much of the rest fails to raise any material inconsistency. With regard to the photographs taken at the bridge, Benavides testified that Defendant held the handgun against the seat and in such a way as to obscure it from general view. Relatedly, it is entirely plausible that someone would be able to hold a gun with their non-dominant hand on a point-blank target. Furthermore, Benavides testified that the Nuevo Laredo pharmacy was located on either the street *Guerrero* or *Obregon*. This is consistent with the Google map in that it shows these streets to run parallel. Defense counsel erred in understanding Benavides to say that the pharmacy was located at the intersection of these streets.

But meriting particular discussion is a large swath of patently inadmissible evidence. As discussed above, although the Rules of Evidence do not apply at a preliminary hearing, a magistrate judge may still require that any evidence exist in some admissible form for purposes of trial. Benavides' bare arrest record and his dismissed federal intimidation complaint represent but examples, as Federal Rule of Evidence 609 allows for impeachment of a witness's character for truthfulness only through the use of certain classes of actual convictions.

The defense has also failed to make a showing of admissibility with respect to one of the lynchpins of their case, the polygraph exam. The Fifth Circuit has held that expert testimony on polygraphs is not *per se* inadmissible. *See United States v. Posado,* 57 F.3d 428 (5th Cir. 1995). Instead, any polygraph evidence must survive the strictures of both Rule of Evidence 702, the rule governing admission of expert testimony, and Rule 403, which requires balancing the probative value of evidence against its potential for prejudice. *See Posado,* 57 F.3d at 432–35. Where Rule 403 would call for exclusion, a detailed analysis under Rule 702 is unnecessary. *See United States v. Pettigrew,* 77 F.3d 1500, 1515 (5th Cir.1996).

Indeed, the tendency is for courts to reject polygraph evidence based on the potential for Rule 403 prejudice. "The cornerstone of our adversary system is the belief that juries and judges are uniquely qualified by experience and common sense to observe witnesses as they testify and decide which version to believe." *United States v. Ramirez,* 1995 WL 918083, at *4 (S.D.Tex. Nov. 17, 1995). The polygraph, however, "emanates an inference of infallibility which improperly interferes with this critical role of the finder of fact as the determiner of credibility." *United States v. Sayavongsa,* 2008 WL 2325622, at *4 (S.D.Tex. June 3, 2008) (citing *Ramirez,* 1995 WL 918083 at *4). Moreover, courts have held polygraph testimony to be overly prejudicial especially where the government was not given the opportunity to participate in forming the questions and observe the examination environment, and release of the results was effectively conditioned on a no-deception opinion. *See United States v. Moultrie,* 552 F.Supp.2d 598, 602 (N.D.Miss.2008); *see also Sayavongsa,* 2008 WL 2325622 at *4; *United States v. Dominguez,* 902 F.Supp. 737, 739–40 (S.D.Tex.1995). Here, the defense has made no attempt to show how it would surmount these Rule 403 hurdles. Also inadmissible for trial as purely self-serving hearsay are Defendant's responses to the exam questions. *See United States v. Jackson,* 180 F.3d 55, 73 (2d Cir.1999). Thus, based on the inadmissibility of the polygraph-related evidence, it is entitled to

little, if any, weight as part of the preliminary examination calculus.

Similarly, the defense has failed to provide any basis for the undersigned to believe that the hearsay testimony referenced in the post-hearing declaration will be admissible. According to the declarant, the manager of the *Farmacia Guadalajara* located on *Obregon* refused to provide a name or provide a written statement. Again, the manager refused to do so for fear of retribution. It thus seems unlikely that such a witness would go so far as to willingly testify for the defense at trial. And despite the ability of a court to levy its subpoena power against unwilling witnesses located within its jurisdictional boundaries, there is no effective process to compel international witnesses to testify in an American court. *See DiRienzo v. Philip Serv. Corp.*, 294 F.3d 21, 30 (2d Cir. 2002). What is more, even if this witness were to be declared unavailable, *see* Fed. R.Evid. 804(a)(2), no hearsay exception would seem to allow for the admission of their out-of-court declaration.

 Regardless, at this stage of the proceedings, the defense's credibility-focused efforts are essentially irrelevant. Again, it is not the role of a magistrate judge to make credibility determinations in assessing whether the government has submitted sufficient evidence to hold the defendant for further proceedings. As the trier of fact on the issue of Defendant's guilt or innocence, any credibility determinations will ultimately be a matter for the jury.

#### b. Alibi

Otherwise, the defense has failed to establish an airtight alibi capable of negating the Government's probable cause evidence. True, there is evidence to corroborate the claim that Defendant went to Nuevo Laredo on the day of the kidnapping to pur-

chase a car part. Defendant's sister offered hearsay evidence to this effect. Also, from the photo submitted by the Government, some sort of car part appears to occupy the bed of Defendant's truck. Moreover, the defense has produced a receipt for a car part purchased in Nuevo Laredo. Notably, the receipt does not indicate who made the purchase. Nevertheless, Benavides claimed that he underwent a two-hour beating, while the available toll bridge and bank receipts indicate that Defendant could have been in Nuevo Laredo for as many as seven hours that day. Not only do these receipts tell a story consistent with the one told by Benavides, they also suggest that Defendant would have had enough additional time to head to the outskirts of Nuevo Laredo, make his purchase, and drive back to the United States. The defense has tried to narrow this timeframe through receipts issued by the Nuevo Laredo toll bridge and Nuevo Laredo auto yard. However, the Government represents that the toll bridge receipt is not in its possession. Furthermore, assuming Defendant himself purchased the car part, the auto yard receipt simply does not indicate the exact time of that purchase.

#### Conclusion

As such, the undersigned FINDS that there is PROBABLE CAUSE to require Defendant's appearance for further proceedings.

IT IS SO ORDERED.